# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| BRENT K. HARJU, LANCE L. TVEITEN, and NORMAN D. VOORHEES, on behalf of themselves and all others similarly situated, and IRON WORKERS LOCAL UNION NO. 512, | Civil No. 08-1329 (JRT/RLE) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| CRAIG OLSON, JEFF DAVEAU, ELIZABETH ADATTE, MARK HUBBARD, JOHN RIIHILUOMA, and MIKE GERBER, as members of the Board of Trustees of the Duluth Building Trades Welfare Fund; and DULUTH BUILDING TRADES WELFARE FUND, | |
| Defendants. | |

Steven L. Severson and Deborah A. Ellingboe, **FAEGRE & BENSON LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402-3901, for plaintiffs.

William A. Cumming, **HESSIAN & MCKASY, PA**, 4000 Campbell Mithun Tower, 222 South Ninth Street, Minneapolis, MN 55402-3801, for named trustee defendants.

John H. Bray, **KANUIT & BRAY, LTD.**, 5155 Miller Trunk Highway, Hermantown, MN 55811, for defendant Duluth Building Trades Welfare Fund.

Plaintiffs Brent K. Harju, Lance L. Tveiten, and Norman D. Voorhees (collectively, the "Individual Plaintiffs"), on behalf of themselves and all others similarly situated, and Iron Workers Local Union No. 512 ("Local 512"), brought this putative

class action against six named members of the Board of Trustees of the Duluth Building Trades Welfare Fund (the "Named Trustees"), and against the Duluth Building Trades Welfare Fund (the "Duluth Fund" or "Fund") alleging breach of fiduciary duty and refusal to produce documents, and seeking a declaration of right to benefits. (Class Action Compl., Docket No. 1.) Local 512 and the Individual Plaintiffs (collectively, "plaintiffs") contend that the Duluth Fund and the Named Trustees (collectively, "defendants") improperly determined that a benefits plan participant's "banked hours" are reduced to zero if the participant's union leaves the Fund, and also improperly refused to produce requested documents relating to that determination. The parties filed cross-motions for summary judgment, and plaintiffs filed a motion for class certification. (Docket Nos. 28, 31, 39, 44.) For the reasons stated below, the Court grants in part and denies in part the motions for summary judgment, and grants plaintiffs' motion for class certification.

## BACKGROUND

Local 512 is an affiliate of the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, AFL-CIO, and consists of over 1300 journeymen members and 350 apprentices working in Minnesota, North Dakota, and parts of Wisconsin. (Class Action Compl. ¶ 5, Docket No. 1.)

The Duluth Fund is an employee welfare benefit plan within the meaning of Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1002(1). (*Id.* ¶ 7.) A trust sponsors and maintains the Duluth Fund, and the Named Trustees are six of the eight members of the Board of Trustees,

which is the body responsible for administering the trust. (*Id.* ¶¶ 9-14; *see also* Named Trustees Answers to Pls.' Combined Disc. at 2, Ellingboe Aff., Ex. A, Docket No. 36.) The Duluth Fund is a multiemployer plan, or "Taft-Hartley" plan, maintained pursuant to a collective bargaining agreement. *See* ERISA § 3(37)(A), 29 U.S.C. § 1002(37)(A). Members of several labor unions, including Local 512, participate in the Fund. (Class Action Compl. ¶ 8, Docket No. 1.) Approximately 621 Local 512 members, including the Individual Plaintiffs, participate in the Duluth Fund. (*Id.* ¶¶ 1-3; Flesher Aff. ¶ 5, Docket No. 37.) Other Local 512 members participate in the Twin City Iron Workers Health and Welfare Fund, which is not a party to this suit. (Mem. in Supp. of Pls.' Mot. for Summ. J. at 4 n.2, Docket No. 32.)

The dispute centers on the practice of "banking hours." Employers make contributions to the Fund on behalf of each participating employee, and the employee receives coverage if he or she has worked a minimum number of hours in a particular month. (Claim Letter, Ex. A at 14, Class Action Compl., Ex. 1, Docket No. 1.) Currently, for example, participants must work a minimum of 135 hours per month to maintain eligibility for benefits. (*Id.*) The employer's contribution is based on the number of hours the employee works in a particular month. (*Id.* at 14-15.) If an employee works fewer than the minimum number of required credit hours, the employer still makes contributions based on the hours worked, but the employee is not automatically eligible for benefits for the relevant month. (*Id.* at 14.) If, however, the employee works more than the minimum number of hours, the employer makes contributions for all of those hours. (*Id.* at 14-15.) The additional hours are "banked,"

and the employee may draw down the banked hours if the employee does not satisfy the minimum hours requirement in a subsequent month. (*Id.* at 15.) The Duluth Fund maintains records of banked hours in the participant's "Individual Record System." (*Id.*) Approximately 405 of the 621 Local 512 members who participate in the Duluth Fund have banked hours. (Flesher Aff. ¶ 5, Docket No. 37.) Local 512 members have a total of 261,060.53 banked hours – an average of 4.76 months of coverage for each participant who has banked hours. (*Id.*) The parties dispute what should happen to those hours if Local 512 elects to withdraw from the Fund.

### A. Documents Governing the Duluth Fund and Provisions Relating to Banked Hours

Several documents govern the Duluth Fund. The Duluth Fund was established pursuant to a Trust Agreement, and the most recent Trust Agreement governing the Fund is dated January 8, 1987. (Trust Agreement, Claim Letter, Ex. C, Class Action Compl., Ex. 1, Docket No. 1.) The Duluth Fund has promulgated several Summary Plan Descriptions, or SPDs, including one effective January 1, 1997 ("1997 SPD"), a revised SPD effective January 1, 2003 ("2003 SPD"), and an SPD that was revised during this litigation and went into effect in 2009 ("2009 SPD"). (Claim Letter, Ex. B, Class Action Compl., Ex. 1, Docket No. 1 (1997 SPD); Claim Letter, Ex. A, Class Action Compl., Ex. 1, Docket No. 1 (2003 SPD); Hanson Aff., Ex. J, Docket No. 34 (2009 SPD).) The Duluth Fund apparently also promulgated several Summary of Material Modification notices announcing interim changes to the SPDs. (*See, e.g.*, Claim Letter, Ex. G, Docket No. 1.)

The Trust Agreement authorizes the Board of Trustees "to amend, repeal, add to or take away any right of payment retroactively or otherwise," but lists several "Limitation[s] of Authority of Trustees." (Trust Agreement §§ 10.1-10.2.) In particular, Section 10.2(d) of the Trust Agreement states that "[t]he Trustees shall have no authority to adopt amendments which . . . retroactively deprive anyone of his vested rights or benefits." (*Id.* § 10.2(d).)

The Trust Agreement also has a provision governing partial termination of the Fund in the event that an employer decides to withdraw from the Fund. Section 11.2 states:

> In the event some of the Employers discontinue making contributions to the Fund, the Employees and Participants who were employed by such Employers, such Employers and the Unions representing such Participants and Employees shall have no right, title or interest in any portion of the assets of the Trust, except that otherwise eligible Employees and Participants may continue to receive benefits from the Fund under such terms and conditions as the Trustees may require or as may be required by this Agreement.

(*Id.* Art. 11.2.)

The 1997 SPD allowed participants to draw down their banked hours after their union or employer left the Fund. The 1997 SPD has a paragraph titled "Non-Portability of Hours." It states:

> **If a participating Union**[] or a group covered by a collective bargaining agreement **ceases to participate** in the Fund, **all** assets and **banked hours** credited to those members on the date of withdrawal **shall remain** as assets of this Fund **credited to the individual Plan participant**. Under no circumstances shall a Plan participant who is a member of the withdrawing group be entitled to transfer any hours to another Fund or any assets represented by such hours.

(1997 SPD at 13, Docket No. 1 (emphases added).)  Effective May 1, 1998, Laborers Local No. 1091 withdrew from the fund, and in a letter dated April 24, 1998, the Fund Trustees quoted the "Non-Portability of Hours" paragraph and stated that "participants with hour banks will continue to be covered under the Duluth . . . Fund until such time that they do not have enough hours to cover another month's worth of coverage." (Hanson Letter at 2, Claim Letter, Ex. F, Docket No. 1.)

In a letter dated December 2001, the Duluth Fund provided participants with a "Summary of Material Modification" to the 1997 SPD.  (Claim Letter, Ex. G, Docket No. 1.)  The letter announces three material modifications that would go into effect on January 1, 2002.[1]  (*Id.*)  One of those modifications imposed a forward-looking cap on the number of banked hours in a participant's Individual Record System:

> The Individual Record System will be capped at 1,600 hours.  This means that once you reach 1,600 hours in your Individual Record System, no more hours will be added.  Members that currently have over 1,600 hours in their Individual Record System will not lose those hours, except for periodic adjustments for contribution rate increases.  Those hours will remain available for use.

(*Id.*)  This modification is incorporated into the 2003 SPD.  (2003 SPD at 15, Docket No. 1.)

---

[1] The letter states that the modifications are "[e]ffective January 1, 2001," which would make the modifications retroactive.  The modification descriptions use the future tense, however, and the 2003 SPD states that the cap was effective on January 1, 2002.  (*See* 2003 SPD at 15, Docket No. 1.)  The Court concludes, for purposes of the motions presently before the Court, that the modifications were effective January 1, 2002.

The 2003 SPD retained the "Non-Portability of Hours" paragraph from the 1997 SPD, as quoted above, but added a "Reduced to Zero" provision regarding banked hours. The provision states:

> **Your credit hours will immediately be reduced to zero** upon either of the following events:
>
> 1. You accept any employment in the Building Trades from an employer who is not a party to a collective bargaining agreement with a participating union; or
>
> 2. **Your home local union takes an action that will terminate the provisions of the collective bargaining agreement which requires contributions for your work.** You will be eligible for coverage based on your hours worked prior to the effective date of the termination. For example, the union decides on January 1 to withdraw from the Fund on February 1. If you have worked the required 135 hours in January, you will have coverage through March 31. If you have not worked the required hours in January, your coverage will end on February 28.

(2003 SPD at 15-16, Docket No. 1 (emphases added).)

The parties dispute when this "Reduced to Zero" provision took effect. Plaintiffs claim that they were not informed of the rule change until the Duluth Fund promulgated the 2003 SPD. (Mem. in Supp. of Pls.' Mot. for Summ. J. at 9, Docket No. 32.) Defendants allege that the Board of Trustees (the "Board") adopted the provision in October 1998. (Trustees Mem. of P. & A. at 3-4, Docket No. 48.) The minutes from an October 19, 1998, Board meeting reflect that Local No. 11 had informed the Duluth Fund that BendTec, an employer, would no longer be contributing to the Fund effective October 5, 1998. (Hanson Aff., Ex. A at 1, Docket No. 34.) The union informed the Fund "that it was their intent to run out their bank hours with the Fund prior to BendTec transferring them to the company's Blue Cross Blue Shield Plan." (*Id.*) The Board of

Trustees refused to allow the union to do so, and instead passed a motion stating that "the Fund would accept the contributions through October 5, 1998, for the metal trades employees of BendTec and terminate those employees' coverage effective November 30, 1998, as they no longer meet the definition of employee or employer under the Trust Agreement and Summary Plan Description." (*Id.*) John Bray, counsel for the Duluth Fund, "distributed copies of sample wording regarding rules for when eligibility terminates." (*Id.* at 2.) Bray indicated that the sample wording was from another fund, and it used language similar to that in the Reduced to Zero provision that appears in the 2003 SPD. The minutes reflect that the Trustees "asked Mr. Bray to review it and draft new language to be presented at the next Trustees meeting on November 19, 1998." (*Id.*)

The Board apparently adopted a resolution on November 19, 1998, but the wording of that resolution is substantively different from the Reduced to Zero provision in the 2003 SPD. The minutes from the November 19, 1998, Board meeting state that "Mr. Bray discussed his resolution amending the plan rules regarding plan eligibility and termination rules and the individual record system." (Hanson Aff., Ex. B at 2, Docket No. 34.) The minutes state:

> After a lengthy discussion, a motion was made, second [sic] and carried:
>
> Motion to accept the resolution as proposed effective November 19, 1998. The following will be added to the current rules regarding self-payment:
>
> Notwithstanding the foregoing, your hour bank shall be immediately reduced to zero if either of the following events happen [sic]:
>
> (1)    You accept any employment in the building trades from an employer who is not a party to a collective bargaining agreement with a participating union; or

(2)    Your home local union **takes an action that** terminates or **will at some future date terminate the provisions** of the local union's collective bargaining agreement **requiring contributions** for your work. Eligibility for all benefits which would have been paid or received after the date of such action **regardless of the action's effective date**, shall be lost immediately.

(*Id.* at 2-3 (emphases added).) The primary substantive difference between the 1998 resolution and the 2003 SPD is that the 1998 resolution purports to reduce banked hours to zero immediately if the participant's union takes an action to terminate contributions, "regardless of the action's effective date," while the 2003 SPD allows a participant to maintain eligibility "for coverage based on . . . hours worked prior to the effective date of the termination."

In the course of discovery, counsel for the Named Trustees produced an undated letter from the Board addressed to "Dear Participant," purporting to be a Summary of Material Modification to the 1997 SPD. (Ellingboe Aff., Ex. F, Docket No. 36.) It states, "The Trustees want to inform you that effective October 1, 1998 that [sic] a change has been made in the Individual Record System (Credit Hours)." (*Id.* at 1.) It describes an addition to the 1997 SPD that is almost identical to the resolution approved in the November 19, 1998, Board meeting. (*Compare id.* at 1 ("Your credit hours will immediately be reduced to zero upon either of the following events . . . .") *with* Hanson Aff., Ex. B at 2, Docket No. 34 ("Notwithstanding the foregoing, your hour bank shall be immediately reduced to zero if either of the following events happen [sic] . . . .").)

The 2009 SPD, which is only indirectly relevant to the motions currently before the Court, revises the Non-Portability of Hours paragraph to make it more consistent with the Reduced to Zero provision. The following paragraph illustrates those changes with

strike-throughs for the language that appears in the 2003 SPD but not in the 2009 SPD, and with underlining for the language that appears in the 2009 SPD but not in the 2003 SPD:

> If a participating Union or a group covered by a collective bargaining agreement ~~ceases to participate~~ <u>ends participation</u> in the Fund, all ~~assets and~~ banked hours ~~credited to~~ <u>recorded for</u> those members <u>of the Union or group</u> on the date of withdrawal ~~shall remain as assets of this Fund credited to the individual Plan participant~~ <u>will be reduced to zero</u>.  <u>All contribution</u> [sic] <u>received by the fund attributable to hours worked through the date of termination remain assets of this Fund</u>.  <u>If your Union or group withdraws participation,</u> <u>U</u>~~u~~nder no circumstances ~~shall a Plan participant who is a member of the withdrawing group~~ <u>will you, or the Union or group,</u> be entitled to transfer any hours <u>or any assets related to those hours</u> to another Fund <u>or entity</u> ~~or any assets represented by such hours~~.

(*Compare* 2009 SPD at 10, Hanson Aff., Ex. J, Docket No. 34 *with* 2003 SPD at 16, Docket No. 1.)  The 2009 SPD retains the Reduced to Zero provision that appeared in the 2003 SPD, with some minor stylistic changes.

## B.     The History of the Duluth Fund's Treatment of Banked Hours After Withdrawal

Several other unions or employers withdrew from the Fund after Laborers Local No. 1091 withdrew in May 1998.  The first withdrawal was the BendTec withdrawal on October 5, 1998, which prompted the November 1998 Board resolution discussed above.

Effective May 1, 2001, Cement Masons Local No. 633 withdrew from the Fund.  (Ellingboe Aff., Ex. G, Docket No. 36.)  Defendants have submitted affidavits from some of the Trustees stating that the Fund reduced to zero the banked hours for Local 633 members upon that union's withdrawal.  (*See, e.g.*, Olson Aff. ¶¶ 5-6, Docket No. 30.)

On July 31, 2001, Sheet Metal Workers' International Association, Local Union No. 10, wrote to the Duluth Fund to inform the Fund that Local 10 "has implemented its right under the current collective bargaining agreement to transfer contributions from your Plan to the Twin Cities Plan commencing with contributions accrued for work hours performed on or after August 1, 2001." (Sandberg Letter, Hanson Aff., Ex. D, Docket No. 34.) The letter noted that Local 10 had "attempted to engage [the Duluth Fund] in a discussion concerning continued eligibility rights of sheet metal workers who are participants in your Plan if Local 10 were to act on its contractual right to transfer contributions from your Plan to the Twin Cities Plan." (*Id.*) The letter indicated that Local 10 had some awareness of at least one potentially relevant plan amendment regarding the effective date of the Reduced to Zero provision:

> We have been given to understand you recently resolved to modify your Plan's rules to permit participants to continue eligibility based on current contributions until it would otherwise expire for contributions due and owing prior to a switch in contributions rather than to immediately cut off eligibility as it was claimed your Plan's prior rule apparently called for.

(*Id.*) This letter suggests that by July 31, 2001, the Board had modified the language adopted in the November 1998 Board meeting, because that resolution required that banked hours be reduced to zero effective immediately if the participant's union "takes an action that terminates or will at some future date terminate" the union's participation in the Fund. There is no evidence in the record to indicate whether or when the Board made such a change.

On March 19, 2002, Bray wrote to the business agent of the Bricklayers and Allied Craftworkers Local Union No. 1, stating that because Local 1 had taken action to

withdraw from the Fund, Local 1 "participants' hour banks are reduced to zero as of the date the action was taken." (Bray Letter, Hanson Aff., Ex. I, Docket No. 34.)

Defendants have submitted affidavits from some of the Trustees stating that the Floorcoverers' Union also withdrew from the Fund after the 1998 amendment, and that the Fund reduced to zero the banked hours of that union's members upon withdrawal. (*See, e.g.*, Olson Aff. ¶¶ 5-6, Docket No. 30.) The record reflects that at some point in 2003, the Floorcoverers transferred their membership from the Carpenters Local No. 361, a Fund participant, to Local No. 596, which is not a Fund participant. (Ellingboe Aff., Ex. G, Docket No. 36.)

### C.     Local 512's 2007 Claim Letter

At some point prior to the end of 2007, Local 512 investigated the welfare fund options available to its members and concluded that it was in the best interests of its members to participate in the Twin City Iron Workers Health and Welfare Fund (the "TCIW Fund"), rather than the Duluth Fund. Local 512 favored the TCIW Fund because it "is specifically designed to meet the needs of iron workers and because it provides more generous benefits than the Duluth Fund." (Claim Letter at 2, Class Action Compl., Ex. 1, Docket No. 1.)

The Board denied Local 512's informal request that the Board allow Local 512 members to draw down any banked hours in the Duluth Fund after their employers ceased making contributions to the Fund. (*See* Claim Letter at 3, Class Action Compl., Ex. 1, Docket No. 1.) On April 13, 2007, Local 512 wrote a letter to Darrell Godbout, who was then Chairman of the Board of Trustees, requesting a meeting with the Board of

Trustees "to discuss . . . the termination of contributions to the Duluth [Fund and] the ability of departing participants . . . to run out their banked hours when contributions made on their behalf terminate." (Witt Letter at 1, Claim Letter, Ex. D, Docket No. 1.) "[A]s an alternative to an hours run-out," Local 512 suggested "a transfer of assets and liabilities" to the TCIW Fund. (*Id.*) The record does not reflect whether a meeting took place, but at some point in 2007 the Board denied Local 512's informal requests. (Claim Letter at 3, Class Action Compl., Ex. 1, Docket No. 1.)

On December 26, 2007, Local 512, acting through counsel, sent a letter to the Duluth Fund (the "Claim Letter"). (*Id.*) The letter states that it is regarding a "**Claim for Declaration of Right to Exhaust Banked Hours <u>Brought on Behalf of Members of Iron Workers Local 512</u>**." (*Id.* at 1 (emphases in original).) The Claim Letter states that "[t]he Union is pursuing this claim on behalf of all of its members who have banked hours in the Duluth Fund[.]" (*Id.*) It further states that "[t]he Union is authorized to pursue this claim on its members' behalf consistent with its role as representative for its members, as set out in the applicable Collective Bargaining Agreement ('CBA') among the Union" and several employers. (*Id.* at 1 n.2.)

The Claim Letter explains that Local 512 "plans to use [its] authority to cease Employer Contributions to the Duluth Fund" and to direct employers to make contributions to the TCIW Fund. (*Id.* at 2-3.) It explains that "[b]efore the Union makes a final decision, however, the Claimant Members are entitled to know whether they will be allowed the benefit of the banked hours they have accumulated in the Duluth Fund." (*Id.* at 3.) The Claim Letter then argues that the Trust Agreement and the 2003 SPD

"require[] the Trustees to allow participants to run out their banked hours after Employer Contributions made on their behalf cease," noting that this conclusion is consistent with the April 1998 decision regarding the withdrawal of Laborers Local No. 1091. (*Id.* at 3-5.) The Claim Letter also argues that the amendments reflected in the 2003 SPD are ineffective, to the extent that they purport to eliminate departing participants' rights in their banked hours. (*Id.* at 7-8.)

The Claim Letter also requests certain documents and other information. (*Id.* at 9-10.) First, it requests all information "required to be furnished to participants under ERISA §§ 104(b)(2) and 502(c)," including "all 'pertinent documents' within the meaning of Section 104(b)(2)." (*Id.* at 9.) Second, it requests all information "required to be furnished to participants under ERISA § 502 and 29 C.F.R. § 2560.503-1(i)(5)," including "[a]ny board resolutions (draft, proposed or final) regarding any amendments to the Duluth Plan or Trust Agreement concerning banked hours." (*Id.* at 9-10.) Third, it requests "[a]ny other information or documents relating to the design, operation, exhaustion or cessation of banked hours in the Duluth Fund, including, without limitation, any communications or advice of the Duluth Fund's consultants and counsel." (*Id.* at 10.)

The Claim Letter attaches several documents, including the 1997 and 2003 SPDs, the 1987 Trust Agreement, and correspondence relating to the withdrawal of Laborers Local 1091 in 1998. (Claim Letter Appx., Docket No. 1.)

**D.     Exclusion of Trustee Godbout from the January 11, 2008 Board Meeting**

The Court describes in some detail the events leading up to the Board's denial of Local 512's claim because plaintiffs allege that those events involved procedural irregularities, a factor that is relevant to the legal standard governing the Court's review of that decision.

Soon after the Board received the Claim Letter, the Board determined that it should exclude Darrell Godbout, a member of Local 512 and one of the eight Duluth Fund Trustees, from the Board's consideration of the Claim Letter.  On January 3, 2008, Chairman of the Board John Riihiluoma left Godbout a telephone message informing him that there would be a special Board meeting on January 11, 2008.  (Godbout Aff. ¶ 2, Docket No. 33.)  Riihiluoma told Godbout that he "could be present at the meeting for all matters, except consideration of Local 512's claim.  He said this decision was made on the advice of Fund counsel," John Bray.  (*Id.*)  In response to this message, Godbout consulted with counsel for the Iron Workers Pension and Health and Welfare Funds, who assisted Godbout in preparing a letter to the Board.  (*Id.* ¶¶ 3-4.)

On January 7, 2008, Godbout wrote to the other seven Trustees stating that he had "been advised by the Chairman of the Board of Trustees that a determination has been made (by whom I am not sure) that I – as a Union Trustee who is also a member of the Iron Workers Local 512 – should not and will not participate in the consideration of or voting on the Claim."  (Jan. 7 Godbout Letter at 1, Class Action Compl., Ex. 2, Docket No. 1.)  Godbout objected to that determination, stated that he was "fully prepared" to "carefully and impartially consider the Claim and render an independent decision that

- 15 -

[he] believe[s] to be in the best interests of the Fund and its participants," and argued that he had "both a contractual and legal right to participation" in the decision. (*Id.*) He argued that neither the Trust Agreement nor ERISA allows the Board to exclude him. (*Id.* at 1-3.) He further argued that, "[t]o the extent that some Trustees believe that I cannot participate in the determination of the Claim because of a perceived conflict of interest, then the same is also true of **all** of the Fund's Trustees." (*Id.* at 3.)

Godbout attached two proposed resolutions to his letter. He presented a proposed resolution that would allow him to participate in the determination of the claim. (*Id.* at 4.) Godbout also included a proposed "conditional resolution which, if a decision is made to exclude me based on a perceived conflict of interest, would preclude all of the Fund's Trustees from determining the Claim for the same reason," and which would require the Board to select an impartial umpire, in accordance with the Trust Agreement provisions regarding the disqualification of all Trustees. (*Id.*) That impartial umpire would then decide the matter. (*Id.*)

On January 8, 2008, Bray prepared a memorandum to the Trustees regarding the plan amendments relating to banked hours. (Duluth Fund Supplemental Answers to Combined Set of Disc. at 3, Flesher Aff., Ex. A, Docket No. 37.)

The parties dispute whether the Board voted to exclude Godbout from the meeting of the Board of Trustees on January 11, 2008. Defendants allege that Godbout voluntarily excluded himself from the meeting. They state:

> The Trustees did not advise Mr. Godbout that he would not be allowed to participate in the consideration of [Local 512's] letter before a meeting, but rather, Mr. Godbout (in spite of the allegations of the Complaint and the language used in Mr. Godbout's correspondence) voluntarily excused

himself from the meeting after being advised that he had a conflict of interest pertaining to the issues raised by [Local 512's] letter. The Trustees did not offer a resolution to exclude Mr. Godbout.

(Duluth Fund's Supplemental Answers to Combined Set of Disc. at 2, Flesher Aff., Ex. A, Docket No. 37; *see also* Named Trustees Answers to Pls.' Combined Disc. at 2, Ellingboe Aff., Ex. A, Docket No. 36 ("Trustee Godbout was not told that he was not allowed to participate. Mr. Godbout was asked if he would recuse himself, and leave the meeting. Mr. Godbout subsequently excused himself and left the meeting."); Olson Aff. ¶ 7, Docket No. 30 ("The other board members suggested that Mr. Godbout take no part in the deliberations or decision on what to do with the Local 512 and he then left the meeting voluntarily. . . . We took no formal action to exclude him from the meeting because we did not need to do so."); Adatte Aff. ¶¶ 10-11, Docket No. 71 ("[N]o one at the board meeting told Darrel Godbout that he was required to leave. . . . Instead of anyone forcing Mr. Godbout to leave, he voluntarily left the meeting."); Daveau Aff. ¶ 10-11, Docket No. 72 (same); Gerber Aff. ¶¶ 10-11, Docket No. 73 (same); Hubbard Aff. ¶¶ 10-11, Docket No. 74 (same).)

Plaintiffs state that the Trustees excluded Godbout from the relevant portion of the meeting. Godbout describes the meeting as follows:

When it came time for the Board to consider the Claim, I was asked . . . to leave the meeting. I responded that I would not leave the meeting until I had an opportunity to state my position and to present the resolutions enclosed with my January 7, 2008 letter. I then proceeded to state my position which largely summarized what I had said in my January 7, 2008 letter. I also presented each of the resolutions for a vote by the Board. In neither case did I receive the necessary second from another Trustee to bring the resolutions to a vote by the full Board. At that point, I was again asked to leave the meeting. Recognizing that I had lost my effort to participate in consideration of the Claim, I got up and left the meeting. By

no means did I leave the meeting "voluntarily," as I understand from Plaintiffs' counsel the Fund has alleged in its Answer to the Complaint.

(Godbout Aff. ¶ 6, Docket No. 33.)

The minutes from the meeting, which were subsequently amended on February 29, originally stated:

> Chairman Riihiluoma stated that he had a couple of telephone conversations with Mr. Godbout regarding today's meeting. Chairman Riihiluoma then asked Mr. Godbout to voluntarily leave the meeting so the other Trustees could discuss the Iron Workers claim. Mr. Godbout presented his case as to why he should be allowed to remain during the discussion stating that he represents all members of the Fund and has not made a decision on the Iron Workers claim. He feels that he would be unbiased in his decision. Mr. Bray, distributed a copy of this memo regarding his decision on this matter. He stated that in his legal opinion this would be a prohibited transaction to allow Mr. Godbout to take part in any vote on the hour bank issue. Mr. Bray stated that it was his legal opinion that Mr. Godbout not be presented [sic].

> After considerable discussion, **Mr. Godbout made a motion: Motion – to allow him to remain present at the remainder of the meeting.** Hearing no second, the motion failed. Mr. Godbout then left the meeting voluntarily.

(Olson Aff., Ex. A at 1, Docket No. 30.)

The minutes further reflect the Board's action on the Claim Letter after Godbout left the meeting. They state:

> Mr. Bray then reviewed the Iron Workers' claim. Mr. Bray stated first and foremost, he does not believe Local 512 is authorized to bring a suit on behalf of their members. He stated that there is case law regarding that. He stated that even with that in mind, he feels they need to respond to the claim. Mr. Bray stated that he felt the benefit comparison is of no matter regarding this issue. He stated that the hour bank is kept only to determine eligibility and the funds are not segregated and accounted for on behalf of each member. He stated the funds are pooled thereby making them a non-vested item and thereby a fund asset.

> Mr. Bray stated that the sole and exclusive benefit rule, in his opinion is being misrepresented. He stated that this benefit rule applies to all of the participants, not a select few.

- 18 -

> After some discussion, a motion was made, seconded and carried: Motion – to have Mr. Bray proceed with his response. It was noted that there was one abstaintion [sic] from voting.

(*Id.* at 1-2.)

On January 14, 2008, Godbout wrote another letter to his fellow Trustees. (Jan. 14 Godbout Letter, Class Action Compl., Ex. 3, Docket No. 1.) The letter expressed Godbout's "strong objection to [the Board's] decision to exclude [Godbout] from participating in consideration of Local 512's Claim at the Board meeting on Friday, January 11, 2008." (*Id.* at 1.) Godbout argued that there was no legal or factual basis for the Board's decision to exclude him from the meeting, and that the decision violated the Trust Agreement, ERISA, and relevant case law. (*Id.*) Godbout stated that the Board must "meet as soon as possible to establish a fair and appropriate process for the selection of an impartial umpire to decide Local 512's claim" because the Trustees "are unable to decide Local 512's Claim consistent with [their] fiduciary duties as trustees of the Fund and . . . any decision [they] make will be tainted by [their] conflicts of interest." (*Id.* at 1-2.) He also "demand[ed] that the Board inform [him] immediately and in writing what took place at the meeting after [Godbout] was removed." (*Id.* at 1.) The letter included "a proposed resolution by which the Board would authorize [the] seven trustees to petition the Court to name an impartial trustee and name [Godbout] as the sole respondent," pursuant to 29 U.S.C. § 186(c)(5). (*Id.* at 2.)

### E. The Duluth Fund's Denial Letter

After the January 11 meeting, the Duluth Fund sent Local 512's counsel a letter dated January 31, 2008 (the "Denial Letter"), which counsel received on February 28,

2008. (Denial Letter, Duluth Fund Answer, Ex. A, Docket No. 3; *see* Class Action Compl., Ex. 4, Docket No. 1.) The letter included the following qualifications in response to the Claim Letter:

> [T]he Trustees are treating your letter, for the sake of argument only, as an appeal within the meaning of the Plan documents. This does not mean that the Trustees believe your letter to be an appeal resulting from denial of benefits. The Trustees reserve their right to assert that your letter does not constitute an appeal, that no decision was even made to appeal from, and that the Local 512 is not entitled to act on behalf of all of its members, some of whom may not agree with the positions taken in your letter.

(Denial Letter at 1, Docket No. 3.)

The Denial Letter provided several substantive responses to the Claim Letter. First, the Duluth Fund argued that banked hours are not a vested benefit belonging to individual participants, and stated that the Fund maintains banked hour accounts for individual participants merely for record-keeping purposes. (*Id.* at 2.) Second, the Duluth Fund argued that the Trust Agreement requires the Trustees to safeguard Fund assets by barring individuals who have left the Fund from using Fund resources. (*Id.*)

The Denial Letter responded to Local 512's request for documents but did not include any responsive documents. (*Id.* at 3.) In response to the request for documents under ERISA §§ 104(b)(2) and 502(c), the Duluth Fund stated, "By virtue of your letter, [which attached the 1997 and 2003 SPDs and the 1987 Trust Agreement,] you are in possession of all documents we believe are responsive to this request. If you wish to make a request for **specific** documents, please do so and we will consider it." (*Id.*) In response to the request under ERISA § 503 and 29 C.F.R. § 2560.503-1(i)(5) for board resolutions "regarding any amendments to the Duluth Plan or Trust Agreement

concerning banked hours," the Duluth Fund responded, "You are in possession of all such documents." (*Id.* at 4.) In response to the request for "[a]ny other information or documents relating to the . . . operation . . . of banked hours in the Duluth Fund," the Duluth Fund responded, "You are in possession of documents related to the banked hours. With regard to your request for communications by the Fund's consultants and counsel, you are not entitled to those documents; accordingly, those documents are not produced." (*Id.*)

### F. The February 29, 2008 Board Meeting

Two items in the minutes from the February 29, 2008, Board Meeting relate to banked hours. First, the minutes reflect that the Board approved a change to the minutes of a previous Board meeting. (Feb. 29, 2008 Minutes at 1, Duluth Fund Answer, Ex. B, Docket No. 3.) The change reflects that Trustee Godbout was "removed from the meeting," over his objection:

> The Trustees reviewed the minutes of their meetings held October 31, 2007 and January 11, 2008. It was noted that the October 31, 2007 [sic][2] minutes should reflect that **Mr. Godbout objected from** [sic] **being removed from the meeting** stating that he was elected by the building trades as a representative and that he had the right to be at the meeting. **A motion was made, seconded and carried**: Motion – to approve the minutes as corrected.

(*Id.* (first emphasis added).)

---

[2] The Court does not have a copy of the minutes from the October 31, 2007, Board meeting. The context of the February 29, 2008, minutes strongly suggests that the amendment applied to the minutes from the January 11, 2008, Board meeting, which originally stated that Godbout "left the meeting voluntarily."

Second, the minutes reflect a "new business" item proposed by Rick Berg, a union Trustee. (*Id.* at 4.) "Mr. Berg presented a resolution to allow any withdrawing group to take their hour banks upon withdrawal." (*Id.*) In response to Berg's presentation, "Mr. Bray stated that Mr. Berg could not make the motion due to his conflict of interest." (*Id.*)

The minutes state that Godbout attended the meeting, but they do not mention the proposed resolution that Godbout sent to the Trustees on January 14. (*See id.* at 1-5.)

### G.    Documents Produced in February 2009

Nearly nine months after plaintiffs filed suit, the Duluth Fund produced several documents relevant to the document requests in the Claim Letter. On February 10, 2009, the Duluth Fund produced the minutes from the Board meetings on October 19, 1998, November 19, 1998, and January 21, 1999. (*See* Flesher Aff. ¶ 2, Docket No. 37; Duluth Fund Supplemental Answers to Combined Set of Disc. at 2-3, Flesher Aff., Ex. A, Docket No. 37; Ellingboe Aff., Ex. D, Docket No. 36.) Those minutes include Bray's resolutions about the Reduced to Zero provision, which later appeared in a different form in the 2003 SPD. On February 11, 2009, the Duluth Fund produced the undated letter to Fund participants explaining that the Reduced to Zero amendment took effect on October 1, 1998. (Ellingboe Aff., Ex. F, Docket No. 36.)

### H.    Procedural History

On May 15, 2008, the Individual Plaintiffs and Local 512 brought suit in the United States District Court for the District of Minnesota, seeking a declaration of right

to benefits (Count One), and claiming breach of fiduciary duty (Count Two) and refusal to produce documents (Count Three). (Class Action Compl. ¶¶ 103-25, Docket No. 1.) On June 2, 2009, the parties filed motions for summary judgment, (Docket Nos. 28, 31, 44), and plaintiffs filed a motion to certify the class (Docket No. 39).

The Duluth Fund raises the following arguments in support of its motion for summary judgment: (1) Local 512 is not entitled to the documents it requested, (2) Local 512 was already in possession of all of the documents to which it might have been entitled, (3) the claim for declaration of right to benefits is not ripe because Local 512 has not withdrawn from the Fund, and (4) plaintiffs are not entitled to relief because the Trustees' interpretation of plan documents was not arbitrary and capricious.

The Named Trustees raise the following arguments in support of their motion for summary judgment: (1) Local 512 lacks standing under ERISA to assert its claims, (2) plaintiffs' claims are not ripe, (3) the individual plaintiffs failed to exhaust administrative remedies and therefore their claims are barred, (4) the statute of limitations bars the claim for breach of fiduciary duty, (5) the Trustees properly applied the terms of the plan with regard to banked hours, and (6) the Trustees did not breach their fiduciary duties in addressing Local 512's request for documents.

Plaintiffs moved for summary judgment on all three causes of action, and also moved for certification of a class of all members of Local 512 who are also participants in the Duluth Fund.

**ANALYSIS**

## I.     MOTIONS FOR SUMMARY JUDGMENT

### A.     Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B.     Affirmative Defenses

Defendants argue that four affirmative defenses warrant summary judgment in their favor: standing, ripeness, statute of limitations, and failure to exhaust administrative remedies.  The Court concludes that none of these arguments has merit.

#### 1.     Standing

The Duluth Fund argues that Local 512 "was not statutorily entitled to receive records . . . , or to obtain relief in district court arising out of its request," and therefore defendants had no obligation to take any action in response to the Claim Letter.  (Duluth Fund Mem. in Supp. of Summ. J. at 10, Docket No. 29.)  The Named Trustees argue that

"Local 512 lacks standing under ERISA to assert" its claims. (Named Trustees' Mem. of P. & A. at 2, Docket No. 48.)

### a. Standing to Request Documents and Bring Administrative Claims

The Duluth Fund argues that Local 512 was not entitled to request records or to bring a claim, and therefore the Fund did not improperly refuse to produce documents and had no obligation to rule on the purported claim. The Court finds that Local 512 was acting as an authorized representative of at least some of its members and therefore was entitled to request documents and bring a claim on their behalf.

ERISA regulations expressly require plans to allow "an authorized representative" of a claimant to act on behalf of that claimant. Under 29 C.F.R. § 2560.503-1(b), an employee benefit plan must have "reasonable claims procedures," and those procedures are "deemed to be reasonable only if," among other things,

> [t]he claims procedures do not preclude an authorized representative of a claimant from acting on behalf of such claimant in pursuing a benefit claim or appeal of an adverse benefit determination. Nevertheless, a plan may establish reasonable procedures for determining whether an individual has been authorized to act on behalf of a claimant . . . .

29 C.F.R. § 2560.503-1(b)(4).

The Claim Letter expressly states that Local 512 was making the claim as an authorized representative on behalf of certain plan participants who have banked hours. (Claim Letter at 1, Class Action Compl., Ex. 1, Docket No. 1.) It also references 29 C.F.R. § 2560.503-1(b)(4) and cites Local 512's authority under its collective bargaining agreement. (*Id.* at 1 n.2.) It attaches a copy of the collective bargaining agreement,

which states that Local 512 serves as the "agent for the Employees whom it represents." (Claim Letter, Ex. H, Docket No. 1.)

Defendants cannot now argue that Local 512 was not authorized to act on behalf of at least some of its members, because there is no evidence in the record to show that defendants ever attempted to ascertain whether Local 512 had such authorization. The Denial Letter does not contend that Local 512 is not an authorized representative. Instead, it states that "[t]he Trustees reserve their right to assert . . . that the Local 512 is not entitled to act on behalf of **all** of its members, some of whom may not agree with the positions taken in your letter." (Denial Letter at 1, Docket No. 3 (emphasis added).) It does not dispute that Local 512 was authorized to represent at least some of its members. It also does not invoke any "reasonable procedures for determining" whether members had authorized Local 512 to act on their behalf, as required by 29 C.F.R. § 2560.503-1(b)(4). Because Local 512 was acting as agent for at least some of its members, it was entitled to request plan documents and to make claims on behalf of those members.

### b.    Statutory Standing to Bring Suit

Defendants do not dispute that the Individual Plaintiffs are plan participants who have standing to bring suit. The parties also do not seem to dispute that Local 512 has Article III associational standing to bring a suit on behalf of its members.[3] *See Warth v.*

---

[3] The Duluth Fund briefly argues that "[t]here is no justiciable controversy presented by Plaintiffs for this Court to address," arguing that plaintiffs' claims "do not call into question the Trustees' authority to amend the Plan." (Duluth Fund Mem. in Supp. of Mot. for Summ. J. at 14, Docket No. 29.) First, plaintiffs do argue that 2003 amendments to the SPD violate the Trust Agreement and violate ERISA. (Mem. in Supp. of Pls.' Mot. for Summ. J. at 34-36, Docket No.

(Footnote continued on next page.)

*Seldin*, 422 U.S. 490, 511 (1975). At issue is whether Congress withdrew that authority when it enacted the standing provisions in ERISA. *See S. Ill. Carpenters Welfare Fund v. Carpenters Welfare Fund of Ill.*, 326 F.3d 919, 922 (7th Cir. 2003).

Section 502(a)(3) of ERISA authorizes civil actions brought:

by a participant, beneficiary, or fiduciary

(A)    to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or

(B)    to obtain other appropriate equitable relief

    (i)    to redress such violations or

    (ii)    to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3). Section 502(a)(1) authorizes "a participant or beneficiary" to bring a civil action to obtain relief from a Plan Administrator's refusal to supply requested information and "to clarify [the participant's or beneficiary's] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(A)-(B).

Neither the parties nor the Court has identified any case from the Eighth Circuit or the District of Minnesota that holds that a union may or may not bring a civil action under ERISA. Courts in other jurisdictions are split on the issue of whether a labor union may bring ERISA claims. *Soc'y of Prof'l Eng'g Employees in Aerospace, IFPTE Local 2001 v. Boeing Co.*, No. 05-1251, 2006 U.S. Dist. LEXIS 71712, at *8 (D. Kan. Sept. 29,

_____

(Footnote continued.)

32.)    Second, the case the Duluth Fund cites simply decided that there **was** a justiciable controversy because the parties disputed whether the trustees had the authority to amend the plan as they did. The court did not hold that the dispute in question was the only possible justiciable controversy. *See Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers Local No. 111 v. Douglas*, 646 F.2d 1211, 1214 (7th Cir. 1981).

2006).  The Third Circuit in *New Jersey State AFL-CIO v. New Jersey* held that "[i]t is clear from [ERISA] that labor unions are neither participants nor beneficiaries, and consequently [the plaintiff-labor union] does not fall within this provision" and cannot bring suit.  747 F.2d 891, 893 (3d Cir. 1984).  Many district courts have adopted this view.[4]  The Eastern District of Pennsylvania subsequently construed *New Jersey State AFL-CIO* in *Pennsylvania Federation, Brotherhood of Maintenance of Way Employees v. Norfolk Southern Corp. Thoroughbred Retirement Investment Plan*, and observed that the Third Circuit in that case was considering whether "a union suing in its own stead" may sue under ERISA, and did not consider "whether the union could bring suit as an association."  No. 02-9049, 2004 U.S. Dist. LEXIS 1987, at *34-35 (E.D. Pa. Feb. 4, 2004).

Recognizing this distinction, the Seventh Circuit rejected the Third Circuit's view "that by confining the right to sue under Section 1132(a)(1) to plan participants and beneficiaries Congress intended to prevent unions from suing on behalf of participants." *S. Ill. Carpenters Welfare Fund*, 326 F.3d at 922; *cf. Beck v. Pace Int'l Union*, 427 F.3d 668, 679 (9th Cir. 2005) (holding that unions have standing to seek equitable relief for

---

[4] *See, e.g.*, *Soc'y of Prof'l Eng'g Employees in Aerospace*, 2006 U.S. Dist. LEXIS 71712, at *10-12; *Toussaint v. JJ Weiser & Co.*, No. 04-2592, 2005 U.S. Dist. LEXIS 2133, at *17-18 (S.D.N.Y. Feb. 13, 2005); *Dist. 65, UAW v. Harper & Row Publishers Inc.*, 576 F. Supp. 1468, 1476 (S.D.N.Y. 1983); *United Food & Commercial Workers Local 204 v. Harris-Teeter Super Mkts., Inc.*, 716 F. Supp. 1551, 1561 (W.D.N.C. 1989); *Commc'ns Workers of Am. v. SBC Disability Income Plan*, 80 F. Supp. 2d 631, 632-33 (W.D. Tex. 1999); *Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am. v. Auto Glass Employees Fed. Credit Union*, 858 F. Supp. 711, 722 (M.D. Tenn. 1994); *Abels v. Titan Int'l*, 85 F. Supp. 2d 924, 930 (S.D. Iowa 2000); *see also Local 6-0682 Int'l Union of Paper, Allied-Indus., Chem. & Energy Workers v. Nat'l Indus. Group Pension Plan*, 342 F.3d 606, 609 n.1 (6th Cir. 2003) ("Unions are not included in the § 502 list, and though a union might qualify as a 'fiduciary' under § 502(a)(3), the Union makes no effort to show how it fits in this category." (citations omitted)).

violations of ERISA relating to "termination procedures"), *rev'd on other grounds*, 551 U.S. 96 (2007). The Seventh Circuit concluded that "[t]he union in such a case is not seeking anything for itself; the real plaintiffs in interest are plan participants." *S. Ill. Carpenters Welfare Fund*, 326 F.3d at 922. Consistent with the Seventh Circuit, the district court in *Pennsylvania Federation* concluded that even though ERISA precludes a union from suing solely on its own behalf, a union "may sue under ERISA using associational standing," and thereby found no conflict between the Third Circuit and the Seventh Circuit. 2004 U.S. Dist. LEXIS 1987, at *35-36. Other courts have reached similar conclusions.[5]

In light of the circumstances of this case, the Court concludes that Local 512 has standing. First, the parties do not dispute that the Court has jurisdiction under ERISA to hear the claims. The Individual Plaintiffs are participants in the Duluth Fund and therefore ERISA allows them to bring this civil action. Even if Congress intended to prohibit unions from bringing ERISA claims when acting in their own stead, here Local 512 is bringing suit on behalf of its members, as evidenced in part by the fact that plaintiffs have asked the Court to certify a class of all Local 512 members who participate in the Duluth Fund. There is no evidence in the record to suggest that Local

---

[5] *See, e.g.*, *Commc'ns Workers of Am. v. Am. Tel. & Tel.*, 828 F. Supp. 73, 74-75 (D.D.C. 1993) (concluding that a union has standing under ERISA if it satisfies the requirements for Article III associational standing), *rev'd on other grounds*, 40 F.3d 426 (D.C. Cir. 1994); *Haw. Teamsters & Allied Workers, Local 996 v. City Express, Inc.*, 751 F. Supp. 1426, 1430 (D. Haw. 1990) (holding that a union has standing under ERISA if it suffered injury in fact, arguably falls within the zone of interests protected by ERISA, and shows that ERISA does not preclude suit); *see also* 2-29 Employee Benefits Guide § 29.02 (2009) ("It seems clear that employees' collective bargaining agents may bring ERISA actions in their behalf.").

512 is seeking anything for itself. Instead, it is seeking to vindicate the rights of its members. Second, as discussed in greater detail below, the Court is certifying a class of all members of Local 512 who are participants in the Duluth Fund. To dismiss Local 512 for lack of standing while certifying a class of all Local 512 members who participate in the Duluth Fund would be an unnecessary exercise in formalism. Third, it is likely that Local 512 "has institutional resources and experience to enforce ERISA, and it may be in a better position to protect the rights of all of its members." *Beck*, 427 F.3d at 679. Local 512 will likely play an important role in identifying class members and communicating with them about the litigation. Local 512's continued participation in the case will allow all parties to proceed with greater efficiency in this class action.

### 2. Ripeness

The Duluth Fund argues that "Plaintiffs' suit is not ripe, as the Plaintiffs have not been denied benefits provided for by the Plan." (Duluth Fund Mem. in Supp. of Mot. for Summ. J. at 12, Docket No. 29.) The Named Trustees argue that the suit is not ripe because "none of the Plaintiffs with standing to make a claim have actually done so. Allowing this matter to proceed to trial on a hypothetical claim that has yet to materialize causes just the quagmire that the [ripeness] doctrine intended to avoid." (Trustees' Mem. of P. & A. at 9, Docket No. 48.) Defendants further assert that the Claim Letter was merely "seeking an advisory opinion." (Duluth Fund's Statement of the Case at 1, Docket No. 10; Named Trustees' Statement of the Case at 2, Docket No. 9.)

Defendants' ripeness arguments fail on both statutory and prudential grounds. First, Section 502(a)(1)(B) of ERISA expressly authorizes plan participants to bring a

civil action "to clarify [their] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). As the Eighth Circuit has noted, "[m]anifestly included within that authorization . . . is the power for a district court to determine what benefits are due and to award them." *Welsh v. Burlington N., Inc., Employee Benefits Plan*, 54 F.3d 1331, 1340 (8th Cir. 1995). Section 502(a)(1)(B) allows courts to entertain "hypotheticals" about future benefits. *Janowski v. Int'l Bd. of Teamsters*, 673 F.2d 931, 935 (7th Cir. 1982), *vacated on other grounds*, 463 U.S. 1222 (1983). "This action is precisely the type of action contemplated by the statute." *Id.* Second, the dispute is more than hypothetical. On December 26, 2007, Local 512 expressed its intent to withdraw from the Plan. Local 512's current collective bargaining agreement authorizes the union to direct that employer contributions to the Duluth Fund cease and be made instead to the TCIW Fund. Indeed, the record reflects that the only obstacle to Local 512 taking this action is the fear that Local 512 members will lose their banked hours. Even without § 502(a)(1)(B), the case presents an actual controversy ripe for adjudication.

### 3. Statute of Limitations

The Named Trustees argue that plaintiffs' claim for breach of fiduciary duties is time-barred. (Trustees Mem. of P. & A. at 9-11, Docket No. 48.) They misunderstand the nature of the claim for breach of fiduciary duties. Plaintiffs argue that the Named Trustees breached their fiduciary duties when they allegedly excluded Trustee Godbout from the Board meeting on January 11, 2008, when they failed to address all of Local 512's arguments in rejecting the Claim Letter on January 31, 2008, and when they failed to produce the plan documents requested in the Claim Letter. Plaintiffs filed suit on

May 15, 2008, less than six months after the incidents in which the Named Trustees allegedly breached their fiduciary duties. The statute of limitations for this claim is six years. Minn. Stat. § 541.05 subd. 1(1). Plaintiffs' claim for breach of fiduciary duties is not time-barred.

### 4. Failure to Exhaust Administrative Remedies

"[A]lthough ERISA itself contains no exhaustion requirement," *Burds v. Union Pac. Corp.*, 223 F.3d 814, 817 (8th Cir. 2000), federal courts "have read an exhaustion of administrative remedies requirement into the statute." *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 418 & n.4 (6th Cir. 1998). Defendants argue that because Local 512 was not authorized to bring an administrative claim, the December 26, 2007 letter was not a claim. They further argue that the Individual Plaintiffs, who, according to defendants, are the only plaintiffs entitled to bring an administrative claim, never brought such a claim, and therefore plaintiffs have failed to exhaust remedies under the plan. (Trustees' Mem. of P. & A. at 9, Docket No. 48.)

As discussed in Part I.B.1.a above, Local 512 acted as an authorized representative of at least some of its members who had banked hours. Therefore, the fact that Local 512, rather than an individual participant, wrote the December 26 letter is not a procedural bar to the claims in this suit.

The futility exception applies to plaintiffs' claims. Plan participants are not "required to exhaust if doing so would prove futile." *Brown v. J.B. Hunt Transp. Servs., Inc.*, 586 F.3d 1079, 1085 (8th Cir. 2009). Here, defendants failed to recognize that Local 512 was acting as an authorized representative of plan participants, and also

incorrectly insisted that Local 512 was merely seeking an "advisory opinion," rather than seeking to clarify rights to future benefits. In light of defendants' position, no further administrative procedures would have helped to develop the record for this Court or to provide the parties with any additional relevant information. The Duluth Fund's pattern of conduct in addressing banked hours demonstrates that the Fund would not change its position through any administrative process. (*See also* Severson Aff. ¶ 10, Docket No. 43.)

### C.  Production of Plan Documents (Count 3)

The Court finds that plaintiffs are entitled to summary judgment on Count 3 and are entitled to civil penalties, but denies without prejudice plaintiffs' request for additional equitable relief. Viewing the evidence in the light most favorable to defendants, no reasonable trier of fact could conclude that defendants did not violate § 104(b)(2) of ERISA by failing to produce requested plan documents.

Section 502(a)(1)(A) of ERISA allows plan participants and beneficiaries to bring a cause of action against a plan administrator if the administrator "refus[es] to supply requested information" where ERISA requires the administrator to disclose such information. 29 U.S.C. § 1132(a)(1)(A), (c). The purpose of the disclosure provision is to ensure that "the individual participant knows exactly where he stands with respect to the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 118 (1989) (internal quotation marks omitted). "This suggests that, all other things being equal, courts should favor disclosure where it would help participants understand their rights." *Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1070 (6th Cir. 1994).

Section 104(b)(4) of ERISA requires a plan administrator[6] to provide upon request copies of all instruments under which the plan is established or operated. 29 U.S.C. § 1024(b)(4). It states:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary[] plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or **other instruments under which the plan is established or operated**.

29 U.S.C. § 1024(b)(4) (emphasis added). The Eighth Circuit has construed this "other instruments" language narrowly:

> The statute does not define the term "other instruments under which the plan is established or operated." . . . In common legal parlance, that means instruments which govern the plan, rather than those which simply evidence its operation. . . . [W]e agree with the circuits that have construed "other instruments" as meaning, not any document relating to a plan, but only formal documents that establish or govern the plan.

*Brown v. Am. Life Holdings, Inc.*, 190 F.3d 856, 861 (8th Cir. 1999).

Defendants contend that, from October 1, 1998, until January 1, 2003, the November 1998 Board resolution and the undated "Dear Participant" letter regarding that resolution governed the plan.[7] Those documents appear to be the only documents that memorialize that particular amendment language. Defendants do not dispute that the Duluth Fund applied that resolution in addressing the withdrawals of BendTec, Cement

---

[6] Defendants do not dispute that they are plan administrators governed by these disclosure provisions. *Cf. Brown*, 586 F.3d at 1088. (*See* Duluth Fund Mem. in Supp. of Mot. for Summ. J. at 21, Docket No. 29 (conceding that the Trustees "are, by operation of law, both the 'plan administrator' as well as fiduciaries'").)

[7] The Court notes that it is possible that a different Board resolution or plan instrument governed the plan during part of this period, as evidenced by the substantive differences between the November 1998 Board resolution and the 2003 SPD, and as further evidenced by the July 31, 2001 letter from Sheet Metal Workers Local 10, which suggests that the Board had recently modified the relevant language adopted in the November 1998 Board resolution.

Masons Local 633, Sheet Metal Workers Local 10, and Bricklayers Local 1 from the Fund. (*See* Named Trustees' Mem. in Supp. of Mot. for Summ. J. at 6, Docket No. 48; Duluth Fund's Mem. in Supp. of Mot. for Summ. J. at 5-6, Docket No. 29.)

Local 512 requested the November 1998 Board resolution in writing, but the Duluth Fund's response to the request suggested that there was no such resolution. In the December 26, 2007 Claim Letter, Local 512 requested "[a]ny board resolutions . . . regarding any amendments to the Duluth Plan or Trust Agreement concerning banked hours." In response to this request, the Duluth Fund stated, "You are in possession of all such documents." None of the documents attached to the Claim Letter made any reference to the November 1998 resolution or its effective date. Nothing in the Claim Letter suggests that Local 512 was in possession of the requested documents.

The requested documents fall within the scope of § 104(b)(4) because they implicate the issue of vesting.[8] "[P]rior versions of the summary plan descriptions requested by a plan participant fall within the scope of the penalty provisions of [§ 104(b)(4)] if they are material to an evaluation of the claimant's rights." *Huss v. IBM Med. & Dental Plan*, No. 07-7028, 2009 WL 780048, at *10 (N.D. Ill. Mar. 20, 2009). Because defendants argue that the Reduced to Zero provision went into effect in 1998, governing documents regarding the effective date of the language are material to a determination of whether and when banked hours ceased to be vested benefits.

---

[8] Although plaintiffs argue that defendants were obligated to produce the requested documents under 29 C.F.R. § 2560.503-1, the Eighth Circuit recently held that "a plan administrator may not be penalized under § 1132(c) for a violation of the regulations to § 1133." *Brown*, 586 F.3d at 1088.

The maximum statutory penalty for defendants' failure to produce the November 1998 Board resolution is $42,020.[9]  Section 502(c)(1)(B) "authorizes the district court to impose statutory penalties upon a plan administrator if the plan administrator 'fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant.'"  *Brown*, 586 F.3d at 1088.  The statutory penalty provision states:

> Any administrator . . . (B) who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C. § 1132(c)(1)(B).  The Secretary of Labor increased the maximum daily penalty to $110.  29 C.F.R. § 2575.502c-1.  Defendants had 30 days from December 26, 2007, to produce the resolution.  They produced the resolution on February 10, 2009, 382 days late.

"The purpose of ERISA's statutory penalty is to punish noncompliance.  The employer's good faith and the absence of harm are relevant in deciding whether to award a statutory penalty."  *Chesnut v. Montgomery*, 307 F.3d 698, 704 (8th Cir. 2002) (citations omitted).  The length of delay is also a factor courts may consider in determining an

---

[9] The Court declines to treat defendants' failure to produce the Board meeting minutes and their failure to produce the "Dear Participant" letter as two separate violations.  Either document would have given plaintiffs sufficient notice of the terms governing the plan.

award of civil penalties. *Brown v. Aventis Pharms., Inc.*, 341 F.3d 822, 825 (8th Cir. 2003).

The Court finds that defendants acted in bad faith and deliberately concealed the November 1998 board resolution from plaintiffs.

Defendants' failure to act for over a year, despite plaintiffs' repeated communications, is evidence of defendants' bad faith. The Eighth Circuit has recognized that a plan administrator's "failure to act for a period of several months, despite [the participant's] repeated phone calls, could be considered bad faith," and may support an award of maximum damages. *Brown*, 341 F.3d at 825. Plaintiffs have submitted evidence of the extensive efforts of plaintiffs' counsel to obtain the relevant documents, and of defendants' counsel's delay in complying with document requests. (*See, e.g.*, Ellingboe Aff. ¶¶ 3-13, Docket No. 15; *id.* Exs. A-H; Ellingboe Aff. Exs. A-F, Docket No. 36.) The Fund's counsel failed to respond to plaintiffs' counsel's request for a "meet and confer" to discuss defendants' delay in responding to plaintiffs' discovery requests, and then failed to respond to plaintiffs' counsel's emails and requests to set up telephone calls to establish a timeline for discovery responses and initial disclosures. (Ellingboe Aff. ¶¶ 8-9, 11-13, Docket No. 15.)

Defendants' history of dealing with a similar request for the November 1998 resolution is further evidence of bad faith. The record shows that when another individual expressly requested a copy of the November 1998 resolution, defendants refused to produce it. George Sundstrom was a member of the Board of Trustees in 1998 and attended the meeting during which the Board approved the resolution. (Hanson Aff.,

Ex. B, Docket No. 34.) The record suggests that he was also a member of Sheet Metal Workers Local 10, which withdrew from the Fund effective August 1, 2001. On October 29, 2001, Sundstrom requested in writing "a copy of all minutes of the Board's action(s) regarding the termination of Bendtec, Inc. employees from the Fund." (Sundstrom Letter No. 1 at 2, Hanson Aff., Ex. E, Docket No. 34.) Sundstrom's letter states that he requested on several occasions that the Fund office manager provide him with a copy of the minutes from that meeting. (*Id.* at 1.) After a second request, the manager "said the Board had asked their legal counsel to research if I was entitled to a copy of those minutes and that Attorney John Bray would get back to me with that decision." (*Id.*)

Sundstrom eventually received a response from Bray, who stated that "we cannot provide you with copies of the documents you requested. You are no longer a participant or beneficiary of the plan, and the law does not entitle us to provide more documents to you." (*See* Sundstrom Letter No. 2, Hanson Aff., Ex. G, Docket No. 34.) Sundstrom responded in writing, stating that the Fund "terminated the pre-funded future eligibility (bank hours) of the Sheet Metal Workers without notice and then you state that we are not entitled to documents as we are no longer participants." (*Id.*) Sundstrom repeated his request for the resolution, and the record indicates that the Board of Trustees treated his second request as an appeal and denied the request at a meeting on November 30, 2001. (Claim Appeal, Hanson Aff., Ex. H, Docket No. 34.)

Defendants' refusal to provide plan documents to Sundstrom, who had a colorable claim that he would prevail in a suit for benefits in the form of banked hours, *see Bruch*,

489 U.S. at 117-18, is evidence that defendants' failure to produce that same resolution to Local 512 was deliberate, rather than inadvertent. *See Medoy v. Warnaco Employees' Long Term Disability Ins. Plan*, 43 F. Supp. 2d 303, 309-10 (E.D.N.Y. 1999). Defendants were aware of the importance of the resolution and previously denied a request for it. Bray, who responded to Sundstrom's request, who wrote the Denial Letter, and who is counsel for the Duluth Fund in this matter, was aware of the resolution and should have been aware of the fact that it fell within the scope of Local 512's request when he responded to that request in 2008. His insistence in his January 31, 2008 letter that Local 512 already had all of the documents it requested was misleading, at best.

The Court further finds that defendants' refusal to provide plan documents has harmed plaintiffs. Plaintiffs state that "Defendants' refusal to produce documents has caused Plaintiffs to incur sizeable legal fees to obtain documents Plaintiffs should have received within 30 days of their request." (Mem. in Supp. of Pls.' Mot. for Summ. J. at 10, Docket No. 32.) As noted above, the record confirms that plaintiffs needed to spend time, effort, and money in obtaining the documents to which they were legally entitled. Under such circumstances, the award of maximum damages may be appropriate. *See Brown*, 341 F.3d at 825 ("[A]lthough Brown did not suffer any loss of health benefits due to the delay, she was forced to invest time, effort, and money in hiring an attorney to gain access to information that she was legally entitled to. Thus it was not an abuse of discretion for the district court to award maximum damages.").

Defendants argue that plaintiffs cannot have suffered any prejudice because a member of Local 512 has been on the Board of Trustees from 1998 to the present.

(Duluth Fund Mem. in Resp. at 8, Docket No. 51.)  They argue that "[i]t is hard to fathom Plaintiffs' mental gymnastics in denying [Local 512] had no [sic] notice of the 1998 Plan amendments."  (*Id.*)  The fact that one member of Local 512 knew of the amendments at the time they were adopted does not demonstrate that Local 512 itself, its counsel, or all of its members, knew of the amendments at the time of the document request, nearly ten years later.  The fact that a union member sits on a board of trustees does not mean that the plan administrator is absolved of its obligations to other members of that union.  Indeed, even if Local 512 had notice of the amendments, defendants' misleading response to the request prejudiced plaintiffs by leading them to conclude that the amendments first went into effect with the 2003 SPD.  Moreover, defendants have failed to come forward with any evidence to suggest that plaintiffs knew or should have known that the amendment was effective October 1, 1998.

Because plaintiffs have shown both bad faith and harm, the Court concludes that they are entitled to the maximum civil penalties of $110 per day, totaling $42,020.  The Court finds that an award of the maximum penalty under these circumstances furthers the purposes of punishing noncompliance and providing plan administrators with an incentive to comply with the requirements of ERISA.  *See Starr v. Metro Sys., Inc.*, 461 F.3d 1036, 1040 (8th Cir. 2006).

Plaintiffs also request equitable relief, as authorized under Section 502(c)(1)(B).  *See* 29 U.S.C. § 1132(c)(1)(B).  Local 512 argues that the Court should bar defendants

from relying on the 1998 plan amendments in this proceeding.[10]  (Mem. in Supp. of Pls.'

Mot. for Summ. J. at 18, Docket No. 32.)   Defendants' initial response to the request for

plan documents led Local 512 to believe that the relevant amendments were effective as

of 2003, when the 2003 SPD went into effect, rather than as of 1998.  Now, however,

defendants argue that the relevant amendments went into effect on October 1, 1998.

Although equitable considerations suggest that defendants should not be allowed to gain

a strategic advantage at trial by asserting that the amendments took effect in 1998, rather

than 2003, the Court concludes that it is premature to decide whether such equitable relief

is appropriate.  The Court therefore denies plaintiffs' request without prejudice.

The Court further orders defendants to provide plaintiffs with copies of any Board

resolution, Summary of Material Modification, or other plan document in existence prior

to the 2003 SPD that reflects the Board's decision to allow a participant to maintain

eligibility for coverage based on hours worked prior to the effective date of the decision

to withdraw from the Fund.  The existence of such documents is suggested by the

differences in language between the resolution adopted in November 1998 and the

Reduced to Zero provision that appears in the 2003 SPD, and by the letter from Sheet

Metal Workers Local 10 dated July 31, 2001, indicating that the Board was

contemplating such a decision at that time.

---

[10] Local 512 also argues that the Court should preclude defendants from relying on the 2009 SPD, because defendants failed to produce it under their obligation to supplement responses to plaintiffs' requests for production of documents. (Mem. in Opp. to Defs.' Mots. for Summ. J. at 24-25, Docket No. 58.)  The Court has not yet determined whether the 2009 SPD has any relevance to its resolution of plaintiffs' claims, and therefore the Court declines to reach the issue at this time.

### D. Breach of Fiduciary Duty (Count 2)

Local 512 argues that the Named Trustees breached their fiduciary duties in three ways: (1) failing to produce plan documents; (2) failing to address all of the arguments presented in the Claim Letter; and (3) excluding Godbout from the Board meeting on January 11, 2008, and failing to appoint an impartial umpire to rule on plaintiffs' claim. The Court finds that defendants are entitled to summary judgment on the first and second claims, and that neither side is entitled to summary judgment on the third claim.

Section 404(a)(1) sets forth the duties of an ERISA fiduciary:

> a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
>
> (A)     for the exclusive purpose of:
>
>> (i)     providing benefits to participants and their beneficiaries; and
>>
>> (ii)     defraying reasonable expenses of administering the plan; [and]
>
> . . .
>
> (D)     in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

29 U.S.C. § 1104(a)(1); *see also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009) (quoting ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1)). Section 502(a)(3) authorizes a plan participant to enforce these fiduciary duties by bringing a civil action "to enjoin any act or practice which violates" ERISA or the terms of the plan or to obtain other appropriate relief "to redress such violations or . . . to enforce any provision of" ERISA or the terms of the plan. 29 U.S.C. § 1132(a)(3).

Trust fiduciaries have a duty of loyalty to plan participants and beneficiaries. "Under principles of equity, a trustee bears an unwavering duty of complete loyalty to the

beneficiary of the trust, to the exclusion of the interests of all other parties." *NLRB v. Amax Coal Co.*, 453 U.S. 322, 329 (1981). "[T]he fiduciary provisions of ERISA were designed to prevent a trustee from being put into a position where he has dual loyalties, and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries." *Id.* at 334 (internal quotation marks omitted). "[T]he duty of loyalty requires fiduciaries to deal fairly and honestly with all plan members[.]" *Braden*, 588 F.3d at 598 (internal quotation marks omitted). "[A]n individual union's duty extends only to the members of the bargaining unit it represents, while a trustee's duty extends to all the participants and beneficiaries of a multi-employer plan." *Am. Fed. of Television & Radio Artists Health & Ret. Funds v. WCCO Television, Inc.*, 934 F.2d 987, 989 (8th Cir. 1991).

### 1. Failure to Produce Plan Documents

Defendants are entitled to summary judgment on plaintiffs' claim for breach of fiduciary duty for failure to produce plan documents because ERISA elsewhere provides adequate relief for the injuries related to those actions. Section 404(a)(1)(D) requires fiduciaries to act in accordance with plan documents, and the 2003 SPD states that all participants are entitled to "[o]btain copies of all Plan documents and other Plan information upon written request to the Plan administrator." (2003 SPD at 69, Docket No. 1.) As discussed in Part I.C, Local 512 made a written request on behalf of its members, but the defendants did not timely provide copies of the requested documents. Although the defendants did not act in accordance with the plan documents, and thereby breached their fiduciary duty under § 404(a)(1)(D), a cause of action under § 502(a)(3) is

generally not appropriate where ERISA provides adequate relief under a different provision. *Wald v. Sw. Bell Corp. Customcare Med. Plan*, 83 F.3d 1002, 1006 (8th Cir. 1996). Here, plaintiffs brought a claim for failure to produce plan documents under § 502(a)(1)(A), and they have prevailed on that claim. To the extent plaintiffs argue that they are entitled to particular injunctive or declaratory relief arising out of defendants' failure to produce plan documents, § 502(a)(1)(A) affords the Court latitude to grant such relief. Therefore, a claim under § 502(a)(3) is duplicative and unnecessary.

### 2. Failure to Address All Arguments

Defendants are also entitled to summary judgment on plaintiffs' claim for breach of fiduciary duty for failure to address all of the arguments presented in the Claim Letter, because there is no such fiduciary duty under the circumstances of this claim. Section 503(1) of ERISA requires each plan to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial[.]" 29 U.S.C. § 1133(a). There is no legal support for plaintiffs' argument that plan administrators have a fiduciary duty to address all arguments that a claimant presents.[11]

---

[11] Local 512 cites cases that are distinguishable on their facts. For example, *Derksen v. CAN Group Life Assurance Co.*, No. 04-3411, 2005 U.S. Dist. LEXIS 39152, at *27-28 (D. Minn. Nov. 8, 2005), involved a regulation that required the defendant "to reference the specific Plan provisions upon which its decision was based" in making an eligibility determination. Local 512 has not identified any similar regulation applicable here. In *Marolt v. Alliant Techsystems, Inc.*, 146 F.3d 617, 620 (8th Cir. 1998), the plan administrator "did not provide a rationale for its decision." Here, plaintiffs simply disagree with the proffered rationale.

In *Lawrence v. Motorola, Inc.*, No. 04-1553, 2006 WL 1371615, at *4 (D. Ariz. May 16, 2006), the court did not suggest that it was a breach of fiduciary duty to fail to address certain

(Footnote continued on next page.)

### 3.     Exclusion of Trustee Godbout

Plaintiffs argue that "[t]he Trustees breached two separate fiduciary duties by excluding Trustee Godbout from participating in the determination of Plaintiffs' Claim." (Mem. in Supp. of Pls.' Mot. for Summ. J. at 20, Docket No. 32.)  First, they argue that the Named Trustees "breached the duty to act in accordance with the documents governing the Fund."  (*Id.*)  Second, they argue that "by excluding Trustee Godbout, the Trustees breached their duty to carry out their obligations 'with respect to a plan solely in the interest of the participants and beneficiaries, [and] for the exclusive purpose of providing benefits to participants and the beneficiaries.'"  (*Id.* (quoting ERISA § 404(a)(1); alteration in original).)

Because there is a genuine issue of fact regarding whether the Named Trustees excluded Godbout, plaintiffs are not entitled to summary judgment on this claim. Viewing the facts in the light most favorable to the Named Trustees, Godbout left the meeting voluntarily.  (Def. Named Trustees' Mem. in Opp'n to Pls.' Mot. for Summ. J. at 10, Docket No. 64; Named Trustees' Reply Mem. for Summ. J. at 6-7, Docket No. 70.) Under those circumstances, the Named Trustees did not "exclude" Godbout, and therefore a reasonable trier of fact could conclude that there was no breach of fiduciary duty arising out of Godbout's alleged exclusion.

_____

(Footnote continued.)

issues, but simply concluded that, "if an administrator fails to reach an issue, de novo review will . . . apply to the determination of that issue."   In *Wuollet v. Short-Term Disability Plan of RSKCo*, 360 F. Supp. 2d 994, 1010 (D. Minn. 2005), the court suggested that the defendant could not raise "additional reasons for rejecting" a claim where the defendant "never asserted these [reasons] in its denial letters as reasons for its decision."

The Named Trustees contend that they are entitled to summary judgment on this claim because Godbout voluntarily left, and because "there is no evidence that the remaining Trustees acted in any manner other than in the interest of all of the other participants." (Named Trustees' Mem. in Supp. of Mot. for Summ. J. at 13, Docket No. 48.) Defendants argue that the "Named Trustees acted solely in the interest of the Plan as a whole, rather than for the interest of a particular participant or group." (Named Trustees' Reply Mem. for Summ. J. at 8, Docket No. 70.) They claim that "the Named Trustees were acting under a concern for the financial solvency and health of the entire plan, not just what was good for Local 512." (Named Trustees' Mem. in Opp'n to Pls.' Mot. for Summ. J. at 10, Docket No. 64.)

As with Local 512's motion for summary judgment on this claim, the Court cannot grant summary judgment in favor of defendants where, as here, defendants' position is premised on a disputed fact. The Named Trustees contend that they did not exclude Godbout, but for purposes of their motion for summary judgment, the Court must view the facts in the light most favorable to Local 512. Godbout states that the Named Trustees excluded him and forced him to leave the meeting. The Named Trustees' bare assertion that they "were acting under a concern for the financial solvency and health of the entire plan," (Def. Named Trustees' Mem. in Opp'n to Pls.' Mot. for Summ. J. at 10, Docket No. 64), is not sufficient to warrant summary judgment in defendants' favor. Local 512 contends that the Named Trustees were in a conflicted position because denying Local 512's claim would bolster Fund assets, thereby benefitting the remaining employers and workers. (Reply Mem. in Supp. of Pls.' Mot. for Summ. J. at 6, Docket

No. 77.) Giving Local 512 the benefit of all reasonable inferences that can be drawn from the alleged decision to exclude Godbout, the Court finds that a reasonable trier of fact could conclude that the Named Trustees breached their fiduciary duties in excluding Godbout by failing to deal fairly and honestly with all plan members, and by failing to carry out their obligations solely in the interest of plan participants and beneficiaries.

### E.     Determination of Right to Benefits (Count 1)

Plaintiffs argue that the Trustees' claim denial was an abuse of discretion, and that the Reduced to Zero provision is invalid because it violates ERISA and the Trust Agreement. Defendants argue that they are entitled to summary judgment on Count 1 because the claim denial was not arbitrary and capricious or an abuse of discretion. The Court finds that neither side is entitled to summary judgment on Count 1.

### 1.     Standard of Review for the Fund's Determination That Local 512 Members Would Not Be Entitled to Draw Down Their Banked Hours if Local 512 Withdrew from the Fund.

Ordinarily, a court reviews a denial of benefits under a *de novo* standard of review. *See Bruch*, 489 U.S. at 115. But "we review the plan administrator's decision [to deny ERISA benefits] for an abuse of discretion when the benefit plan grants the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Jackson v. Prudential Ins. Co. of Am.*, 530 F.3d 696, 700 (8th Cir. 2008) (internal quotation marks omitted; first alteration omitted); *see also Hackett v. Standard Ins. Co.*, 559 F.3d 825, 829 (8th Cir. 2009). Therefore, if "the summary plan description grants [the plan] discretionary authority both to determine benefit eligibility

and to construe the terms of the group contract," "the proper standard of review . . . is for abuse of discretion."  *Jackson*, 530 F.2d at 700 (internal quotation marks omitted).

Plaintiffs concede that the Duluth Fund gives the Trustees discretionary authority to determine eligibility and to construe plan terms.  (Mem. in Supp. of Pls.' Mot. for Summ. J. at 23, Docket No. 32.)  Plaintiffs argue that the Court should nonetheless review the claim under a less deferential standard of review, and that, in the alternative, the Court should weigh the Named Trustees' conflict of interest in determining whether they abused their discretion in denying the claim.

A plan's claim denial is subject to "less deferential review" if there is a "procedural irregularity" in the decision-making process.  *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998), *abrogated on other grounds as recognized by Hackett*, 559 F.3d at 830.  The claimant must present "material, probative evidence demonstrating that (1) . . . a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to [the claimant]."  *Id.*; *see Wakkinen v. UNUM Life Ins. Co. of Am.*, 531 F.3d 575, 582 (8th Cir. 2008) (stating that if the plaintiff asserts a "procedural irregularity" that is not a conflict of interest governed by *Metropolitan Life Insurance Co. v. Glenn*, 128 S. Ct. 2343 (2008), "[w]e continue to examine this claim under *Woo*").  The Eighth Circuit has recognized that "[a] less deferential standard is only warranted when a beneficiary shows that the plan administrator, in the exercise of its power, acted dishonestly, acted from an improper motive, or failed to use judgment in reaching its decision."  *Menz v. Procter & Gamble Health Care Plan*, 520 F.3d 865, 869 (8th Cir. 2008).  "Additionally, the irregularity must have some connection to the

substantive decision reached[.]" *Id.* Under this less deferential standard of review, "the evidence supporting the plan administrator's decision must increase in proportion to the seriousness of the . . . procedural irregularity." *Woo*, 144 F.3d at 1162.

Even in the absence of a procedural irregularity, if the plan administrator was operating under a conflict of interest, the reviewing court should factor in that conflict in applying the abuse of discretion standard of review. *Hackett*, 559 F.3d at 830 (citing *Glenn*, 128 S. Ct. 2343). And even if plaintiffs fail to prove a serious breach of fiduciary duty, the "conflict should be weighed as a factor in determining whether there is an abuse of discretion." *Id.* (internal quotation marks omitted). The conflict of interest "is more important . . . where circumstances suggest a higher likelihood that it affected the benefits decision and less important . . . where the administrator has taken active steps to reduce potential bias and to promote accuracy." *Id.* (internal quotation marks omitted).

At the summary judgment stage, the Court cannot determine the appropriate standard of review because there are disputed facts surrounding the decision to deny Local 512's claim. For example, the trier of fact must determine whether the Named Trustees excluded Godbout and whether, if they did so, his exclusion amounts to a "procedural irregularity." The trier of fact must also determine whether the Named Trustees acted dishonestly or from an improper motive in denying the claim. The trier of fact must also determine whether there was some connection between the alleged procedural irregularities and the decision to deny the claim.

For the reasons stated below, the Court finds that neither side is entitled to summary judgment on Count 1 because under the standard of review most favorable to

the party opposing summary judgment, a reasonable trier of fact could find in favor of the non-movant. Plaintiffs would be entitled to summary judgment if, under the deferential standard of review, no reasonable trier of fact could conclude that the Named Trustees did not abuse their discretion in denying the claim. Likewise, the Named Trustees would be entitled to summary judgment if, even assuming the most serious type of procedural irregularity or conflict of interest, no reasonable trier of fact could conclude that the Named Trustees erred in denying the claim. Here, however, the facts do not warrant summary judgment for either side.

### 2. Plaintiffs' Motion for Summary Judgment

Plaintiffs contend that even under a deferential standard of review, the Named Trustees abused their discretion in denying the claim.

### a. The *Finley* Five-Factor Test

Viewing the facts in the light most favorable to the defendants, there were no procedural irregularities and the Named Trustees did not operate under a conflict of interest, and therefore the Court reviews the denial of Local 512's claim for an abuse of discretion. Local 512 concedes that under this standard, the Court must determine whether an administrator's interpretation of the plan is "reasonable," using the five-factor test set forth in *Finley v. Special Agents Mutual Benefit Association, Inc.*, 957 F.2d 617, 621 (8th Cir. 1992). (Mem. in Supp. of Pls.' Mot. for Summ. J. at 26-34, Docket No. 32.) Under *Finley*, in determining whether a denial of benefits was reasonable, the Court considers (1) whether defendants' "interpretation is consistent with the goals of the Plan,"

(2) "whether their interpretation renders any language in the Plan meaningless or internally inconsistent," (3) "whether their interpretation conflicts with the substantive or procedural requirements of the ERISA statute," (4) "whether they have interpreted the words at issue consistently," and (5) "whether their interpretation is contrary to the clear language of the Plan." *Id.* Taking into account these factors, the Court finds that, viewing the facts in the light most favorable to the defendants, a reasonable trier of fact could conclude that defendants' interpretation of the plan was reasonable.

*Plan Goals.* The Trust Agreement states that the purpose of the Fund "is to apply the assets of the Trust to provide medical, surgical, hospital health care and death, disability, sickness and accident benefits and other such benefits . . . for the Employees and their dependents." (Trust Agreement § 3.1, Docket No. 1.) An "Employee" is "[a]ny employee on whose behalf payments are required to be made to the Trust by an Employer pursuant to a collective bargaining agreement." (*Id.* § 1.2.) The 2003 SPD states that "[i]t is the goal of the Trustees, along with the Union and your Employer, to provide you and your family with the best accident and health protection possible with the money available." (2003 SPD at 14, Docket No. 1.)

Viewing the facts in the light most favorable to the defendants, a reasonable trier of fact could conclude that defendants' interpretation of the plan documents is consistent with the goals of the Fund. If Local 512 were to withdraw from the Fund, then the employers of its members would no longer be required to make payments to the Fund. Therefore, those Local 512 members would no longer be Employees, as defined by the Trust Agreement. Prohibiting those individuals from drawing down their banked hours is

consistent with the goal of providing benefits to members of the Fund. By refusing to provide benefits to individuals who are not Employees, the Fund would conserve resources for the provision of benefits to those who are.

*Rendering Plan Language Meaningless.* Defendants' interpretation renders the Non-Portability of Hours paragraph in the 1997 and 2003 SPDs meaningless. That provision states that if a participating union ceases to participate in the fund, "all . . . banked hours . . . shall remain . . . credited to the individual Plan participant." If the Fund reduces banked hours to zero, then no hours remain available to "credit" to those participants. Defendants have offered no means to reconcile their interpretation of plan documents or their denial of benefits with this provision of the 2003 SPD.

*ERISA.* Local 512 argues that defendants' interpretation conflicts with ERISA because it "would effectively require participants to forfeit vested benefits, something ERISA forbids." (Mem. in Supp. of Pls.' Mot. for Summ. J. at 29, Docket No. 32.) Local 512 further argues that defendants' interpretation "would violate ERISA's 'sole and exclusive benefit' rule, which requires that the Individual Plaintiffs and putative class members be allowed the benefit of the banked hours they earned that remain credited to their individual accounts." (*Id.* at 30-31.) The Court addresses these arguments in turn, and concludes that neither factor favors a finding that the Named Trustees abused their discretion under the third *Finley* factor.

The terms of the plan documents, rather than ERISA, determine whether benefits in an employee welfare benefit plan are vested, and therefore this argument is not relevant to the third *Finley* factor. Local 512 concedes that welfare benefits do not vest

as a matter of law, but may vest "if a promise to provide vested benefits is incorporated in some fashion into the formal written ERISA plan." *Halbach v. Great-West Life & Annuity Ins. Co.*, 561 F.3d 872, 877 (8th Cir. 2009). "Whether such benefits are vested . . . is a matter of private contract," however, and therefore defendants' interpretation would, at most, conflict with the plan language, rather than with ERISA itself. *See id.* Therefore the Court considers this argument under the fifth *Finley* factor – whether the interpretation is contrary to the clear language of the Plan.

Local 512 argues that ERISA's "sole and exclusive benefit" rule mandates that the Fund give Local 512 members the benefit of the banked hours that they have earned, even if Local 512 leaves the Fund. (Mem. in Supp. of Pls.' Mot. for Summ. J. at 30-31, Docket No. 32.) As discussed above, § 404(a)(1) requires an ERISA fiduciary to discharge his or her "duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

Local 512 cites *L.I. Head Start Child Development Services Inc. v. Kearse*, 86 F. Supp. 2d 143 (E.D.N.Y. 2000), in support of its argument. *Kearse* involved a self-insured fund with accumulated reserves of over $1 million at the time one employer elected to leave the fund. *Id.* at 145. The departing employer "requested the return of that portion of the remaining reserves attributable to past contributions made by [the employer] on behalf of its participating employees." *Id.*

Viewing the facts in the light most favorable to the defendants, the Court cannot at this stage conclude, as a matter of law, that defendants' interpretation violates the sole and exclusive benefit rule. There are several important differences between *Kearse* and the instant case. First, *Kearse* sets forth the facts as found by the court after a bench trial, rather than on a motion for summary judgment. Second, and relatedly, *Kearse* involved contested facts regarding whether the reserve funds were segregated or pooled, whether an amendment to the trust agreement was valid, and whether a second amendment to the trust agreement was properly ratified. *Id.* at 146-50. This Court is not yet able to resolve similar contested facts bearing on a determination of right to benefits. Third, *Kearse* involved a self-insured fund with substantial surplus reserves, and the court found that the requested transfer of funds would not "threaten the financial well being of the . . . Trust." *Id.* at 153. Defendants in this case, however, claim that allowing Local 512 members to draw down banked hours could undermine the ongoing viability of the fund. (Duluth Fund Mem. in Supp. of Mot. for Summ. J. at 25-26, Docket No. 29.)

*Consistent Interpretations.* The fourth *Finley* inquiry is whether defendants "have interpreted the words at issue consistently." 957 F.2d at 621. Local 512 focuses on the Non-Portability of Hours paragraph, noting that in 1998 the Board interpreted this language to allow members of Laborers Local No. 1091 to draw down their banked hours after the union withdrew from the Fund. Local 512 states that "the Plan language on which the Trustees relied in 1998 is the same Plan language on which Plaintiffs rely in seeking the same relief." (Mem. in Supp. of Pls.' Mot. for Summ. J. at 33, Docket No. 32.)

Viewed in the context of the plan documents as a whole, however, this factor does not support a determination at the summary judgment stage that the Named Trustees abused their discretion. Defendants note that the Reduced to Zero provision took effect after the 1998 determination regarding Laborers Local No. 1091. They argue that the Board has consistently interpreted the Reduced to Zero provision ever since it took effect, and that since the Board adopted that provision, the Board has never allowed members of a withdrawing union to draw down banked hours. (Def. Named Trustees' Mem. in Opp'n to Pls.' Mot. for Summ. J. at 15-16, Docket No. 64.) On several different occasions since 1998, therefore, the Trustees have interpreted the plan documents, including the Non-Portability of Hours paragraph and the Reduced to Zero provision, in a manner that is consistent with their interpretation of plan documents in denying Local 512's claim.

*Plan Language.* The fifth *Finley* inquiry asks whether the Trustees' "interpretation is contrary to the clear language of the Plan." Local 512 raises several arguments in support of the conclusion that this factor favors a determination that the claim denial was an abuse of discretion. First, Local 512 argues that the interpretation is contrary to the clear language of the Non-Portability of Hours paragraph. Second, Local 512 argues that the interpretation is contrary to the Trust Agreement, which allows participants to continue to receive benefits from the Fund after their employer withdraws from the Fund. Third, Local 512 argues that the interpretation is contrary to the plan language establishing that banked hours are vested benefits. The Court addresses each

argument in turn, and concludes that none of them supports a finding that the Trustees abused their discretion under the fifth *Finley* factor.

First, as discussed in the context of the second *Finley* factor, defendants' interpretation renders the language in the Non-Portability of Hours paragraph meaningless, but that interpretation is not "contrary to the clear language of the Plan." Local 512 concedes that the Non-Portability of Hours paragraph conflicts with the Reduced to Zero provision, but does not offer a way to reconcile the two provisions. (*See* Mem. in Opp'n to Defs.' Mots. for Summ. J. at 18, 21, 24, Docket No. 58.) The relevant plan language is not clear, and therefore the Court cannot find that defendants' interpretation, which is consistent with one provision but contrary to another, is an abuse of discretion.

Second, the language in the Trust Agreement governing partial termination and employer withdrawals from the Fund is not sufficiently clear to support a finding that the Trustees abused their discretion. One reasonable interpretation of the relevant language in the Trust Agreement is that the provision is permissive, not mandatory. Section 11.2 states that "[i] n the event some of the Employers discontinue making contributions to the Fund," their otherwise eligible employees "**may** continue to receive benefits from the Fund under such terms and conditions as the Trustees may require or as may be required by this Agreement." (Trust Agreement § 11.2, Docket No. 1 (emphasis added).) Ordinarily, only Fund participants and beneficiaries are eligible to receive Fund benefits. One reasonable interpretation is that this provision authorizes, but does not require, the Trustees to give benefits to individuals who are no longer participants or beneficiaries.

Moreover, to the extent that there is a conflict between this provision of the Trust Agreement and the Reduced to Zero provision in the 2003 SPD, the Reduced to Zero provision must prevail. *See Halbach*, 561 F.3d at 877 n.1.

Third, the Court cannot conclude as a matter of law that the Trustees' interpretation is contrary to any "clear language of the Plan" regarding vesting of benefits. As an initial matter, the Trust Agreement expressly recognizes that some benefits may be vested. Defendants state that "a reservation of rights provision defeats a claim that benefits is [sic] a welfare plan are somehow 'vested.'" (Duluth Fund Mem. in Supp. of Mot. for Summ. J. at 15, Docket No. 29.) They identify Section 10.1 of the Trust Agreement as expressing an affirmative intent not to vest benefits. (Duluth Fund Reply Mem. at 12, Docket No. 67.) Although Section 10.1 states that no "person shall have any vested interest or right in the Trust Fund or in any payment from the Trust Fund," (Trust Agreement § 10.1, Docket No. 1), the Trust Agreement allows for the possibility that certain **benefits** may vest. Section 10.2, which enumerates "Limitation[s] of Authority of Trustees," states that "[t]he Trustees shall have no authority to adopt amendments which . . . retroactively deprive anyone of his vested rights or benefits." (Trust Agreement § 10.2(d), Docket No. 1.)

At the time of Local 512's claim, the plan language was not sufficiently clear to warrant a finding that the defendants abused their discretion in concluding that banked hours were not a vested benefit. Local 512 argues that the plan language establishes that banked hours are vested benefits because the Non-Portability of Hours paragraph states

that individual banked hours are credited to individual participants.[12]  Defendants argue that there is "no language evidencing an affirmative intent to vest hour bank benefits," and that in the absence of such an affirmative indication of vesting, the banked hours are not vested.  (Duluth Fund Mem. in Supp. of Mot. for Summ. J. at 16, Docket No. 29.)  Prior to the Reduced to Zero amendment, the plan language in the Non-Portability of Hours paragraph suggested an affirmative intent to vest hour bank benefits.  The Reduced to Zero provision, however, rendered the plan language unclear.  Therefore, the Court cannot conclude, as a matter of law, that defendants' interpretation was contrary to the clear language of the plan.

In summary, the Court cannot conclude, as a matter of law, that the Trustees' interpretation was unreasonable and amounted to an abuse of discretion.  Only one of the five *Finley* factors supports Local 512's position.  Viewing the factors and plan language as a whole, plaintiffs are not entitled to summary judgment on Count 1.

### b.      The 2003 Amendment

Plaintiffs argue in the alternative that the Reduced to Zero provision added to the 2003 SPD is not legally effective to strip Fund participants of their vested banked hours.

---

[12] Local 512 also argues that banked hours are not listed in the "schedule of benefits" section of the SPDs, and therefore they are not subject to the reservation of rights clause in the 1997 SPD, which states that the Board of Trustees may "modify or terminate any and all benefits scheduled in this booklet."  (1997 SPD, Forward at 2, Docket No. 1; Mem. in Supp. of Pls.' Mot. for Summ. J. at 29-30, Docket No. 32.)  As defendants note, however, the Trust Agreement defines the "Plan" as "[t]he **Schedule of Benefits** to be provided for Participants of the Fund which **includes eligibility and termination provisions** and benefit exclusions."  (Trust Agreement § 1.10, Docket No. 1 (emphasis added).)  The Non-Portability of Hours paragraph is part of the section titled "Plan Eligibility and Termination Rules."  As such, it is included in the plan's "Schedule of Benefits," even though it does not appear in the "schedule of benefits" section of the SPD.

(Mem. in Supp. of Pls.' Mot for Summ. J. at 34-35, Docket No. 32) First, Local 512 notes that the Non-Portability of Hours paragraph and the Reduced to Zero provision "are flatly inconsistent," and concludes that therefore the Reduced to Zero provision is not legally effective. Second, Local 512 argues that enforcing the Reduced to Zero provision would cause participants to forfeit a vested right. Third, Local 512 argues that the Reduced to Zero provision "is facially inconsistent with the Trust Agreement," which "provides that the Trustees may not (upon a partial termination) take away benefits from the Fund's participants." (*Id.* at 35.) The Court addresses each argument in turn, and again concludes that Local 512 is not entitled to summary judgment on Count 1.

First, the Court agrees with plaintiffs that the Non-Portability of Hours paragraph is inconsistent with the Reduced to Zero provision, but the contradiction does not automatically render the Reduced to Zero provision legally ineffective. *Cf. Bechtel Corp. v. Local 215, Laborers' Int'l Union of N. Am.*, 544 F.2d 1207, 1211-13 (3d Cir. 1976). There may ultimately be some means of reconciling the two provisions, and at this stage the Court cannot say that the 2003 Amendment was legally ineffective simply because it failed to repeal the Non-Portability of Hours paragraph with which it is in tension. Even if there is no way to reconcile the two provisions, it is premature to conclude that the Non-Portability of Hours paragraph must prevail.

Second, it seems likely that at some point prior to the 2003 Amendment, participants had a vested right to their banked hours. The Non-Portability of Hours paragraph is consistent with vesting, the Fund's treatment of the banked hours of members of Laborer's Local No. 1091 is consistent with vesting, the use of the Individual

Record System to keep track of the banked hours is consistent with vesting, and the December 2001 Summary of Material Modification to the 1997 SPD is consistent with vesting. The Trust Agreement recognizes that certain benefits may vest, and that even though the Trustees "have full authority to amend . . . or take away any right of payment retroactively or otherwise," the Trustees "shall have no authority to adopt amendments which . . . retroactively deprive anyone of his vested rights or benefits." (Trust Agreement §§ 10.1, 10.2(d), Docket No. 1.)

At the summary judgment stage, however, the Court cannot determine as a matter of law that banked hours were vested benefits at any particular time. The Court must view the facts in the light most favorable to the defendants, who argue that the Trustees never viewed hour bank balances as vested benefits, and that the Individual Record System is simply "a notational account" to calculate whether a participant is eligible for benefits in a particular month. (Named Trustees' Mem. in Supp. of Mot. for Summ. J. at 14, Docket No. 48; Def. Named Trustees' Mem. in Opp'n to Pls.' Mot for Summ. J. at 3, Docket No. 64.) Drawing all reasonable inferences from these facts, the Court cannot conclude as a matter of law that banked hours were vested benefits. Moreover, even if banked hours were vested benefits, it may be possible to interpret the 2003 Amendment in a way that is consistent with Section 10.2(d) of the Trust Agreement, which prohibits the Trustees from retroactively depriving participants of their vested benefits. Therefore, the Court cannot conclude that the 2003 Amendment was not legally effective.

Third, as discussed in the previous section, one reasonable construction of the partial termination provision in Section 11.2 of the Trust Agreement is that the language

is permissive, rather than mandatory, and therefore it does not necessarily render the 2003 Amendment legally ineffective. Section 11.2 states that if an employer withdraws from the Fund, "otherwise eligible Employees and Participants **may** continue to receive benefits from the Fund **under such terms and conditions as the Trustees may require**." (Trust Agreement § 11.2, Docket No. 1 (emphases added).) This language does not necessarily preclude the Trustees from determining that such employees are not entitled to continue to receive any benefits.

Plaintiffs also argue that the Reduced to Zero provision in the 2003 SPD, even if legally effective, cannot retroactively take away vested banked hours. (Mem. in Supp. of Pls.' Mot. for Summ. J. at 35-36, Docket No. 58.) The Court is inclined to agree with plaintiffs, but based on the record before the Court and in light of the Court's obligation at the summary judgment stage to view the facts in the light most favorable to the non-movants, the Court cannot determine, as a matter of law, that banked hours were at some point vested benefits. Local 512 is not entitled to summary judgment on Count 1.

### 3.     Defendants' Motion for Summary Judgment

Defendants argue that the Named Trustees' denial of Local 512's claim was reasonable and not arbitrary and capricious or an abuse of discretion, and therefore the Court should uphold the Fund's determination that Local 512 members are not entitled to draw down banked hours in the event that Local 512 withdraws. (Duluth Fund Mem. in Supp. of Mot. for Summ. J. at 17, 23, Docket No. 29.) One fundamental problem with this argument is that the Court cannot determine whether it should review the determination under an abuse of discretion standard or under a more rigorous standard

until the Court resolves factual disputes as to the alleged procedural irregularities surrounding the Board of Trustees meeting on January 11, 2008. For purposes of defendants' motion for summary judgment, therefore, the Court must assume that the Fund's determination is subject to a more rigorous standard of review. Because defendants do not make a showing of how their determination survives that standard of review, they have failed to meet their burden on summary judgment.

## II.  MOTION TO CERTIFY THE CLASS

### A.  Standard of Review

"In order to obtain class certification, a plaintiff has the burden of showing that the class should be certified and that the requirements of Rule 23 are met." *Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir. 1994). A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982). "In reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 168 (3d Cir. 2001). For example, "if some of the considerations under Rule 23[] . . . overlap the merits[,] . . . then the judge must make a preliminary inquiry into the merits." *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001). In considering the Rule 23 requirements, the Court considers that class actions are "a necessary vehicle for the vindication of small claims," and that "[w]hen there is a question as to whether certification is appropriate, the Court should give the benefit of the doubt to approving

the class." *In re Workers' Comp.*, 130 F.R.D. 99, 103 (D. Minn. 1990) (citations omitted).

"Federal Rule of Civil Procedure 23 establishes a two-step analysis to determine whether class certification is appropriate. First, plaintiffs must satisfy the four prerequisites of Federal Rule Civil Procedure 23(a). Second, the action must satisfy at least one of three subdivisions of Federal Rule Civil Procedure 23(b)." *In re Retek Inc. Sec. Litig.*, 236 F.R.D. 431, 434 (D. Minn. 2006).

### B.    The Rule 23(a) Prerequisites

The Court finds that the proposed class, consisting of "all Local 512 members participating in the Duluth Fund," (Mem. in Supp. of Mot. for Class Cert. at 6, Docket No. 40), satisfies the Rule 23(a) prerequisites. Rule 23(a) allows a member of a class to sue as a representative party if "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims of the representative parties are typical of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." *Id.* The parties agree that the proposed class satisfies the first and fourth prerequisites.

### 1.    Commonality

Defendants argue that plaintiffs cannot establish commonality because "[n]ot all of the members of Local 512 . . . share, as a matter of fact, the same hour bank histories or balances." (Trustees Mem. in Opp'n to Class Certification at 3, Docket No. 65; *see also* Duluth Fund Resp. to Mot. for Class Certification at 2, Docket No. 55.)

Common issues of law and fact here include the meaning of various plan documents, whether and when banked hours became vested benefits, and the rights of plan participants going forward. Those common issues are sufficient to satisfy Rule 23(a). The fact that individual class members may not presently have banked hours or have different numbers of banked hours does not defeat commonality. "Commonality is not required on every question raised in a class action. Rather, Rule 23 is satisfied when the legal question linking the class members is substantially related to the resolution of the litigation." *DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995). "[I]ndividual class members need not be 'identically situated' to meet the commonality requirement." *Parkhill v. Minn. Mut. Life Ins. Co.*, 188 F.R.D. 332, 338 (D. Minn. 1999). "The requirement is met where the questions linking the class members are substantially related to the resolution of the litigation even though the individuals are not identically situated." *Id.* The Court finds that the proposed class satisfies the commonality requirement.

### 2. Typicality

Defendants argue that the claims of the representative parties are not typical of the class because the proposed class includes participants who have banked hours as well as participants who do not. The fact that some members of the proposed class do not presently have banked hours does not defeat typicality. "The burden of demonstrating typicality is fairly easily met so long as other class members have claims similar to the named plaintiff." *DeBoer*, 64 F.3d at 1174. "Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or

course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996). All members of the proposed class were allegedly injured by the January 2008 denial of Local 512's claim. They all face the danger that, if and when Local 512 withdraws from the Fund, they will have banked hours and will not have the opportunity to draw down those banked hours. A declaration of a right to future benefits would affect all class members equally, regardless of whether they have banked hours at any particular time. The Court finds that the proposed class satisfies the typicality requirement.

### C.     The Rule 23(b) Requirements

Plaintiffs seek class certification under Federal Rules of Civil Procedure 23(b)(1)(A) and 23(b)(2). Rule 23(b)(1)(A) states that a class action may be maintained if Rule 23(a) is satisfied and if "prosecuting separate actions by or against individual class members would create a risk of . . . inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). Rule 23(b)(2) allows a class action if Rule 23(a) is satisfied and if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Court finds that both class requirements are satisfied.

Rule 23(b)(1)(A) is satisfied because there is a risk that prosecution of separate actions by individual class members would result in inconsistent adjudications that would establish incompatible standards of conduct for the defendants. For example, separate

actions could result in some courts determining that banked hours are vested benefits, and other courts determining that they are not. The Court's resolution of plaintiffs' claims as a class action will avoid such inconsistent results.

Rule 23(b)(2) is satisfied because defendants have acted on grounds that apply generally to all Local 512 members who participate in the Duluth Fund, and because plaintiffs seek declaratory relief. The Denial Letter applies generally to the proposed class, and defendants have never suggested that the Fund would reach a different result if an individual member of Local 512 sought a declaration of right to future benefits. Plaintiffs seek a declaration that Local 512 members have the right to exhaust their banked hours if Local 512 decides to withdraw from the Fund, and that relief is appropriate under Rule 23(b)(2).

Pursuant to Rule 23(b)(1)(A) and (b)(2) of the Federal Rules of Civil Procedure, the Court certifies a class consisting of all Local 512 members participating in the Duluth Fund.

### D.    Appointment of Class Counsel

Plaintiffs move for the appointment of Faegre & Benson, LLP as class counsel under Federal Rule of Civil Procedure 23(g). Plaintiffs' Memorandum in Support of Motion for Class Certification sets forth the relevant criteria for the appointment of class counsel and demonstrates that Faegre & Benson meets each of the criteria. (Docket No. 40 at 17-19.) Defendants do not dispute that Faegre & Benson is suitable class counsel and satisfies the requirements of Rule 23(g). The Court has considered the work that Faegre & Benson has done in identifying and investigating potential claims in this

action, Faegre & Benson's experience in handling class actions and the types of claims asserted in this action, Faegre & Benson's knowledge of the applicable law, and the resources that Faegre & Benson states that it has committed and will commit to representing the class. *See* Fed. R. Civ. P. 23(g)(1)(A). Based on careful consideration of those factors, the Court grants plaintiffs' motion for the appointment of Faegre & Benson as class counsel.

## ORDER

Based on the foregoing and all the files, records, and proceedings herein, the Court **HEREBY ORDERS** that:

1.     Defendant Duluth Building Trades Welfare Fund's Motion for Summary Judgment [Docket No. 28] is **GRANTED in part and DENIED in part**, as follows:

     a.     As to Counts 1 and 3 of the Complaint, the motion is **DENIED**;

     b.     As to Count 2 of the Complaint, the motion is **GRANTED in part and DENIED in part**, as follows:

          i.     As to breach of fiduciary duty for failure to produce plan documents and failure to address all arguments in the Claim Letter, the motion is **GRANTED**; and

          ii.     As to Plaintiffs' remaining claims for breach of fiduciary duty, the motion is **DENIED**.

2.     Defendants Named Trustees' Motion for Dismissal or Summary Judgment [Docket No. 44] is **GRANTED in part and DENIED in part**, as follows:

a.     As to Counts 1 and 3 of the Complaint, the motion is **DENIED**;

b.     As to Count 2 of the Complaint, the motion is **GRANTED in part and DENIED in part**, as follows:

    i.     As to breach of fiduciary duty for failure to produce plan documents and failure to address all arguments in the Claim Letter, the motion is **GRANTED**; and

    ii.     As to Plaintiffs' remaining claims for breach of fiduciary duty, the motion is **DENIED**.

3.     Plaintiff Iron Workers Local Union No. 512 and Individual Plaintiffs' Motion for Summary Judgment [Docket No. 31] is **GRANTED in part and DENIED in part**, as follows:

a.     As to Counts 1 and 2 of the Complaint, the motion is **DENIED**; and

b.     As to Count 3 of the Complaint, the motion is **GRANTED in part and DENIED WITHOUT PREJUDICE in part**, as follows:

    i.     As to Plaintiffs' request for statutory penalties for Defendants' refusal to produce requested documents, the motion is **GRANTED**, and the Court **ORDERS** Defendants to pay Plaintiffs $42,020 in statutory penalties for failure to produce plan documents; and

    ii.     As to Plaintiffs' request for equitable relief, the motion is **DENIED WITHOUT PREJUDICE**.

4.    Plaintiffs' Motion to Certify Class [Docket No. 39] is **GRANTED**, and Faegre & Benson, LLP is **APPOINTED** as class counsel.

5.    The Court further **ORDERS** Defendants to provide Plaintiffs with copies of any plan documents in existence prior to the 2003 SPD that reflect the Trustees' decision to allow a participant to maintain eligibility for coverage based on hours worked prior to the effective date of the decision to withdraw from the Fund.

DATED:  March 29, 2010                                    ___s/ John R. Tunheim___
at Minneapolis, Minnesota.                                       JOHN R. TUNHEIM
                                                              United States District Judge